SO ORDERED.

SIGNED this 20 day of September, 2017.

_Joseph N. Callaway_
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

**MARILYNN JANE HOCH,**                                   Case No.:
                                                          **16-03678-5-JNC**

      **Debtor**

-------------------------------------------------------------

**SCOTT M. HOCH,**
           **Plaintiff**

  **v.**                                           **Adversary Proceeding No.:**
                                                          **16-00123-5-JNC**

**ARTHUR E. HOCH, individually, MARILYNN J.
HOCH, individually, MARILYNN J.
HOCH as TRUSTEE of the MARILYN JANE HOCH
REVOCABLE TRUST, the MARILYN JANE
HOCH REVOCABLE TRUST, MARILYNN J.
HOCH as TRUSTEE of the MARILYNN JANE
HOCH REVOCABLE TRUST, the MARILYNN
JANE HOCH REVOCABLE TRUST, MARILYNN
J. HOCH as TRUSTEE of the JANE HOCH
REVOCABLE TRUST, and the JANE HOCH
REVOCABLE TRUST,**

           **Defendants.**

-------------------------------------------------------------

## ORDER ALLOWING IN PART AND DENYING IN PART CROSS-MOTIONS
## FOR SUMMARY JUDGMENT

The matters before the court are the Motion for Partial Summary Judgment filed by Defendant Marilynn J. Hoch, individually and as trustee for the various trusts named in the case caption above (collectively, "Jane" or the "Debtor") on February 2, 2017 (Dkt. 43; the "Jane Motion"), and the Motion for Partial Summary Judgment filed by plaintiff Scott M. Hoch ("Scott") on February 2, 2017 (Dkt. 44; the "Scott Motion").  Scott and Jane each objected to the summary judgment motion filed by the other, and co-defendant Arthur E. Hoch ("Buddy") opposed the Scott Motion to the extent it seeks the entry of summary judgment against him.  A hearing on the cross-motions for summary judgment was held on June 6, 2017.  At the request of the court, supplemental position papers were filed by the parties on August 11 and 14, 2017.  The matters are now ripe for decision.

## FACTUAL BACKGROUND

This case dates back to 2001, and concerns at its heart a disagreement between two brothers over the proper distribution of net proceeds generated from the sale of real property owned by their investment partnership. The pleadings, deposition testimony, affidavits, answers to interrogatories, admissions on file, and other matters of record in the case establish the following facts as undisputed or indisputable.

Scott and Buddy are brothers, and the chapter 11 debtor Jane is Buddy's wife. Scott and Buddy were both partners in a partnership referred to as WS/CBC. WS/CBC owned real property known as the "WS/CBC Property" sold on January 8, 2001 for $1.75 million. Following the sale, Scott and Buddy disagreed over the amount of the sale proceeds Buddy was entitled to retain and Scott was entitled to receive. Buddy distributed approximately $600,000 (the "WS/CBC Proceeds") from the sale into a brokerage account maintained in Jane's sole name at Raymond James (the "RJ Account") (the "2001 Transaction"). Buddy held signatory rights over the RJ

2

Account, and at no time since 2001 has he held or maintained a bank account in his own name, whether singularly or jointly.

From September 2001 through December 2015, attorney Keith Kapp of Raleigh, North Carolina, represented Scott in the dispute with Buddy. On September 27, 2001, a meeting was held at Mr. Kapp's office to discuss the dispute. Scott, Buddy, Mr. Kapp, and Richard Speers, a financial advisor to both Scott and Buddy, were in attendance. Toward the end of the meeting, when it was clear that a final resolution would not be reached that day, Mr. Speers drafted a hand-written document listing several agreed-upon points. The document (the "Agreement") was signed that day by Scott and Buddy, but not Jane. The original was left with Mr. Kapp and he later caused copies of it to be mailed to Scott, Buddy, and Mr. Speers.  In the Agreement, Buddy indicated that he had the authority to transfer the funds held in the RJ Account and that he would "give notice to Scott before transferring any money out of Jane's account at Raymond James."

The dispute between Buddy and Scott continued unabated for ten years. During this time, Scott and Buddy (but not Jane) entered into a series of tolling agreements concerning the WS/CBC Proceeds. In 2009, Mr. Speers changed brokerage firms, and the RJ Account was moved to a similar account at TD Ameritrade in the name of Jane only, with Buddy retaining signatory rights over the new account (the "TD Account"). On July 27, 2011, Scott sued Buddy (but not Jane) in the Wake County, North Carolina Superior Court in the case of *Scott M. Hoch v. Arthur E. Hoch, et al.*, 11-CVS-1692 (the "2011 Lawsuit").

Extensive discovery was conducted in the 2011 Lawsuit. Thousands of pages of documents were reportedly produced by the litigants, including a copy of the Agreement,

copies of tax returns filed by Buddy and Jane, and some of Jane's RJ Account statements. Several depositions were taken, including those of Mr. Speers. Buddy, and Scott.[1]

While the 2011 Lawsuit was pending, on August 14, 2013, Jane removed Buddy's signatory authority on the TD Account. Shortly thereafter, on September 24, 2013, she formed the Marilynn Jane Hoch Revocable Trust (the "Jane Trust"). The next day, on September 25, 2013, Jane moved the funds, including the WS/CBC Proceeds, from the TD Account into an account held by Jane as the trustee of the Jane Trust (the "2013 Trust Transfer"). Two days later, Jane and Buddy, as tenants by the entirety, conveyed their residence, located on Pictou Road in Raleigh (the "Pictou Road Property") to Jane as the trustee of the Jane Trust.

Then, on October 17, 2013, a partial summary judgment order in favor of Buddy was entered in the 2011 Lawsuit, requiring Scott to transfer to Buddy his one-half interest in two

---

[1] In his deposition testimony, Scott contended he had no recollection of the Agreement:

"I vaguely remember the day."
"I don't remember this anyway. Obviously it's a long time ago, but I don't remember this."
"I don't remember it."
"[B]ut I do not remember anything about this before it was shown to me recently."
"Now I don't have any recollection of this."
"I mean, I don't even remember seeing this."
"Well, I mean, I remember being there and that we discussed this and we tried to come up with— I
    mean, we— well, I don't remember the particulars about it, no. I remember the general
    reason that we had it but not totally what was discussed because they were probably— we
    were probably trying to come to an agreement."
Q: "Is it fair to say you don't remember what was discussed about where the money was?
    A: "Correct. Because I don't even remember this."
Q: "You don't remember Exhibit 2, the agreement?
    A: "I do not."

First Jane Memo, Dkt. 43-1 at 5 (quoting Deposition of Scott Hoch, Dkt. 46-12 at 10–11, 13, 16–17). No explanation has been offered by Scott to explain his loss of memory surrounding the Agreement. However, Scott has affirmatively relied upon the Agreement in the Complaint and his inability to recall the Agreement precludes him from asserting that he did not read it or understand its contents. Further, Scott has not contended in his response to the Jane Motion that he did not sign or should not bound by it. The evidence of the existence of the Agreement is buttressed by the testimony of several other witnesses including the neutral party Mr. Speers and two highly reputable members of the Wake County, North Carolina Bar, Mr. Kapp and Harold "Buzzy" Russell. It is indisputable that the Agreement was signed by Scott, and it stands as authentic and binding in this case.

jointly-owned townhouses located in Wake County, North Carolina, known as 3615 Top of Pines ("3615 TOP") and 3613 Top of Pines ("3613 TOP") (together, the "TOP Properties"). As a result, Buddy owned and controlled the entire interest in the TOP Properties without encumbrance. On December 23, 2013, and January 7, 2014, Buddy ostensibly sold the TOP Properties (first 3615 TOP and then 3613 TOP) to Jane as trustee of the Jane Trust, for a purchase price of $100,000 each. The TOP Properties have since been sold to a bona fide third-party purchaser by the Jane Trust. On February 9, 2014, Jane and Buddy sold a jointly-owned vehicle (the "Vehicle") to CarMax for $21,450.44. Jane used the funds to purchase a new car, which she subsequently titled in her name only.

Scott obtained a judgment against Buddy in the 2011 Lawsuit on February 26, 2014 in the amount of $364,269.[2] Frustrated in his efforts to collect on the judgment against Buddy, and soon after learning of the sales of the TOP Properties, Scott filed the State Court Action against Buddy and Jane, the primary asserted causes of action being founded in alleged violations of the North Carolina Uniform Voidable Transactions Act (the "UVTA"),[3] North Carolina General Statutes §§ 39-23.1 to 39-23.12, for the fraudulent transfers of specified assets *to* Jane, including the TOP Properties and the WS/CBC Proceeds. However, in at least two instances, the Complaint (now the Second Amended Complaint) also alleges voidable transfers of assets *by* Jane. Whether Jane is a transferee or a transferor (or perhaps both) may impact whether Scott has standing to pursue the claims, as under normal circumstances, only a bankruptcy trustee or debtor-in-possession may

---

[2] With interest at the North Carolina legal rate of eight percent (8%) per annum from the date of breach, the judgment amount as of February 2, 2017 was $833,543. *See* N.C. Gen. Stat. §§ 24-1, 24-5(a).

[3] Prior to 2015, the UVTA was known as the North Carolina Uniform Fraudulent Transfer Act. *See* 2015 N.C. Sess. Laws 23. The 2015 amendment was chiefly stylistic, and did not materially alter the substantive law therein. *See also* N.C. Gen. Stat. § 39-23.12 ("This Article, which was formerly cited as the Uniform Fraudulent Transfer Act, may be cited as the Uniform Voidable Transactions Act.").

pursue a fraudulent transfer action, whether under federal or state law, against the transferee of a debtor transferor.

## PROCEDURAL POSTURE

The original complaint in this adversary proceeding was filed in the Superior Court of Wake County, North Carolina, on July 22, 2014, Case No. 14-CVS-9658 (the "State Court Action"). Pursuant to 28 U.S.C. §§ 157, 1334, and 1452, the State Court Action was removed to this court by Jane on July 15, 2016 (*see* Dkt. 9), the same date she filed her chapter 11 petition. Scott did not object to the removal, and, along with Buddy, consented to the jurisdiction of the bankruptcy court and its authority to enter final orders in the case in the Joint Preliminary Pretrial Conference Report signed by respective counsel and filed August 25, 2016. (Dkt. 24).

The cross-motions for summary judgment before the court pertain to the Second Amended Complaint filed on October 1, 2015 (Dkt. 10 at 79–97; the "Complaint"). Nine causes of action are asserted the Complaint, briefly described as follows:

1. Fraudulent Transfer of the WS/CBC Proceeds (regarding the 2001 Transaction);
2. Fraudulent Transfer of the TOP Properties;
3. Fraudulent Transfer of Pictou Road Property;
4. Fraud by Buddy Hoch only;
5. Extending Liability for Claims against Buddy Hoch and Jane Hoch to the Jane Trust;
6. Fraudulent Transfer of WS/CBC Proceeds (regarding the 2013 Trust Transfer);
7. Breach of Contract as to the Agreement;
8. Fraudulent Transfer of the Vehicle; and
9. August 2013 Fraudulent Transfer (regarding Jane's revocation of Buddy's signatory authority on the TD Account).

In the Scott Motion, the plaintiff seeks summary judgment against all defendants on Claims 2, 7, and 8, and against Buddy only on Claim 4. Jane opposes the Scott Motion on the specified claims made against her and, in the Jane Motion, seeks summary judgment in her favor on Claims

1, 2, 3, 5, 6, and 9. Buddy opposes the Scott Motion on the claims asserted against him by Scott, but did not move for summary judgment in his own right.

The parties have filed multiple memoranda of law in support of or opposition to the other's motion. Buddy filed Defendant Arthur E. Hoch's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 48). Jane filed Defendant Marilynn J. Hoch's, Individually and as Trustee, Memorandum of Law in Support of Motion for Partial Summary Judgment (Dkt. 43; the "First Jane Memo"), Defendant Marilynn J. Hoch's Memorandum of Law Opposing Plaintiff's Motion for Partial Summary Judgment (Dkt. 49; "Jane's Opposition Memo"), and Defendant Marilynn J. Hoch's Memorandum of Law in Reply to Plaintiff Scott Hoch's Response to Marilyn [*sic*] J. Hoch's Motion for Partial Summary Judgment (Dkt. 59; "Jane's Reply Memo"). Scott, in turn, filed a Brief in Support of Plaintiff's Motion for Partial Summary Judgment (Dkt. 45; the "First Scott Memo"), Plaintiff's Response to Marilynn J. Hoch's Motion for Partial Summary Judgment (Dkt. 51), and a Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment (Dkt. 61).

As a backdrop for the current cross-motions for summary judgment, prior to the bankruptcy filing and removal of this action, on January 11, 2016, the Honorable Donald W. Stephens, North Carolina Superior Court Judge, heard cross-motions for summary judgment in the State Court Action on Claims 1, 6, and 9. On January 13, 2016, Judge Stephens entered an order denying all motions for summary judgment (Dkt. 8, at 161–63; the "Judge Stephens Order"). Nothing else showing, the findings in the Judge Stephens Order are the "law of the case" and are binding in the removed action. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *McInnis v Phillips*, No. 7:16-CV-261-BO, 2017 WL 219910, at *3 & n.3 (E.D.N.C. June 23, 2017).

## DISCUSSION

### I.    THE STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment if the indisputable facts presented in a case "show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The court must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant . . . ." *Humboldt Express, Inc. v. The Wise Co. (In re Apex Express Corp.),* 190 F.3d 624, 633 (4th Cir. 1999) (citations omitted). The party seeking summary judgment has the initial burden of proving the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. If the initial burden is met, the opposing party must respond and show factual disputes sufficient to advance a genuine issue to trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The court can then decide if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### II.    THE ISSUES RAISED IN THE JANE MOTION WITH RESPECT TO CLAIMS ONE, SIX, AND NINE ARE CONTROLLED BY THE LAW OF THE CASE

#### A.    The Law of the Case Doctrine

This court sits in the position of a "successor judge" to Judge Stephens in this case. Both Jane and Scott moved for summary judgment in the State Court Action with respect to Claims 1 and 6, and Jane, Scott, and Buddy each moved for summary judgment with respect to Claim 9. Judge Stephens Order, Dkt. 8 at 161. The state court denied Scott's motion for summary judgment on Claims 1, 6, and 9, and Scott does not seek reconsideration of that ruling here, conceding that

8

those claims must go to trial. Jane's cross-motions for summary judgment on those three counts were also denied by the state court, but she now seeks reconsideration and entry of partial summary judgment by this court.  To prevail, Jane must, among other things, overcome the doctrine of "the law of the case."

"The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (quoting *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)). The doctrine has two branches. *Ellis v. United States*, 313 F.3d 636, 646 (1st Cir. 2002). The first branch, or mandate rule, "forbids, among other things, a lower court from relitigating issues that were decided by a higher court, whether explicitly or by reasonable implication, at an earlier stage of the same case." *Id.* (citing *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993)). Since the bankruptcy court, like the superior court in Wake County, is a trial level court in this case, the first branch does not apply.  Instead, the court must look to the second branch, which "is somewhat more flexible," and "frowns upon, but does not altogether prohibit, reconsideration of orders within a single proceeding by a successor judge." *Id.*

As a starting point, it is presumed that "a successor judge should respect the law of the case." *Id.* This presumption is supported by numerous important policy considerations, including affording litigants "a high degree of certainty as to what claims are—and are not—still open for adjudication," *id.*, furthering the public's interest in finality and repose, promoting judicial economy and efficiency, and increasing "confidence in the adjudicatory process." *Id.* The law of the case doctrine "applies both to questions actually decided as well as to those decided by 'necessary implication . . . .'" *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 68–69 (4th Cir. 1988) (quoting *Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1320 (5th Cir. 1978)).

9

On the other hand, while prior decisions presumptively govern the same issues later in the case, the law of the case doctrine "is not an 'inexorable command' but rather a prudent judicial response to the public policy favoring an end to litigation." *Sejman*, 845 F.2d at 68 (quoting *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967)). Three well-established exceptions may justify a court in exercising discretion to revisit prior decisions and "depart from the law of the case: (1) 'a subsequent trial produc[ing] substantially different evidence'; (2) a change in applicable law; or (3) clear error causing 'manifest injustice.'" *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003)). The same tests apply whether litigants seek to revisit a final order pursuant to Federal Rule of Civil Procedure 59(e) or an interlocutory order under Federal Rule of Civil Procedure 54(b), but a slightly higher burden must be met when seeking to revisit a final order. *See Carlson*, 856 F.3d at 325. The Jane Motion requests a review of the prior denial of summary judgment, which is an interlocutory order.

Determining whether the Jane Motion is governed by the law of the case requires a two-fold initial analysis. First, the court must assess which questions were actually decided or were decided by necessary implication in the Judge Stephens Order to determine which issues are subject to the law of the case doctrine. Second, the court must evaluate whether any compelling circumstances exist that justify departing from the law of the case and revisiting one or more issues already decided by Judge Stephens. Only if such an exception is shown to apply will this court re-evaluate Claims 1, 6, and 9 as requested in the Jane Motion.

### B.    The Issues Decided in the Judge Stephens Order

In the State Court Action, Judge Stephens held a hearing on the cross-motions for summary judgment on January 11, 2016. Judge Stephens Order, Dkt. 8 at 161. After consideration of the

"pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits . . . ," Judge Stephens determined that there remained "genuine issues as to material facts, such that no party is entitled to judgment as a matter of law" and denied all pending motions for partial summary judgment. *Id.* at 162. Because his order did not identify any undisputed issues of fact, this court must now determine whether any issues were actually decided or were decided by necessary implication in the state court ruling.

### 1.    The Uniform Voidable Transactions Act

Claims 1, 6, and 9 all assert claims for relief arising under the UVTA, North Carolina General Statutes §§ 39-23.1 to 39-23.12. Because the UVTA plays a prominent role in the instant litigation, the court will discuss certain of its provisions in detail.

The UVTA allows a creditor to avoid certain transfers[4] by a debtor when the transfers were made "with intent to hinder, delay, or defraud any creditor of the debtor." N.C. Gen. Stat. § 39-23.4(a)(1). A creditor is broadly defined as "a person that has a claim," N.C. Gen. Stat. § 39-23.1(4), and a claim encompasses "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." N.C. Gen. Stat. § 39-23.1(3). A debtor is "a person that is liable on a claim." N.C. Gen. Stat. § 39-23.1(6). The UVTA, in short, empowers creditors of a debtor to sue transferees of the debtor to avoid certain transfers made by the debtor.

A transfer is defined as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset . . . ." N.C. Gen. Stat. § 39-23.1(12). An asset, in turn, is defined as "[p]roperty of a debtor," N.C. Gen. Stat.

---

[4] Including incurring obligations such as a pledge of collateral or other security interest.

§ 39-23.1(2), with certain enumerated exclusions not presently relevant. Property is then defined in the broadest possible sense as "[a]nything that may be the subject of ownership." N.C. Gen. Stat. § 39-23.1(10). Thus, after navigating the pertinent definitions, the UVTA allows a creditor of a debtor to pursue avoidance of any transfer, against the transferee, of anything the debtor gave, sold, or otherwise conveyed to the transferee.

The cause of action available to a creditor under the UVTA depends upon whether that creditor had a claim against the debtor before the transfer was made, or if the creditor's claim arose after the transfer was completed. In the latter case, which is relevant here, the creditor must proceed under North Carolina General Statutes § 39-23.4.[5] A cause of action under sub-subsection 39-23.4(a)(1), which is alleged in the instant case, has two elements: (1) the debtor must have made a transfer or incurred an obligation, (2) with the intent to hinder, delay, or defraud any creditor of the debtor. N.C. Gen. Stat. § 39-23.4(a)(1). Further, while not essential elements, courts typically weigh thirteen (13) factors in determining whether a debtor made a transfer with the actual intent to hinder, defraud, or delay a creditor, which are enumerated in  § 39-23.4(b).[6] Ultimately, the creditor has the burden of "proving the elements of the claim for relief by a preponderance of the evidence." N.C. Gen. Stat. § 39-23.4(c).

The UVTA also has a limitations provision for actions arising thereunder, which is at the center of Jane's Motion for summary judgment. It provides:

> A claim for relief with respect to a voidable transfer or obligation under this Article is extinguished unless action is brought:
>
> (1) Under G.S. 39-23.4(a)(1), not later than four years after the transfer was made or the obligation was incurred, or, if later, not later than

---

[5] A creditor with a claim against the debtor that predated the transaction may opt to proceed under either North Carolina General Statutes §§ 39-23.4 or 39-23.5.

[6] These factors are often referred to as the "badges of fraud."

one year after the transfer or obligation was or could reasonably have been discovered by the claimant . . . .

N.C. Gen. Stat. § 39-23.9(1) (hereinafter the "UVTA Statute of Repose"). Thus, a creditor with a potential UVTA claim arising under § 39-23.4(a)(1) must bring suit before the later of (a) four years after the transfer or (b) one year after the creditor discovered or reasonably could have discovered the transfer.

### 2.    Claim 1 – 2001 Fraudulent Transfer of WS/CBC Proceeds (Buddy to Jane)

In Claim 1, Scott asserted a claim against Buddy and Jane, jointly and severally, seeking to avoid the transfer of the WS/CBC Proceeds to the RJ Account held in Jane's name only under North Carolina General Statutes § 39-23.4(a)(1) (hereinafter, a claim under this sub-subsection is referred to as a "23.4(a)(1) Claim"). In order for Scott to have prevailed as a matter of law before the state court, he was required to prove that Buddy made a transfer to Jane with the intent to hinder, defraud, or delay Scott.

Jane asserts, as an affirmative defense, that the transfer of the WS/CBC Proceeds into her account in 2001 is barred by the UVTA's Statute of Repose because no lawsuit was filed against her until thirteen years later, on July 22, 2014. Jane's Answer to Pl's. Second Am. Compl., (hereinafter "Jane's Answer"), Dkt. 10 at 201. In order for Jane to succeed and be entitled to judgment as a matter of law, she must show that the present action was initiated after the later of (1) four years after the transfer at issue or (2) one year after Scott knew or reasonably could have known of the transfer. Scott averred in the Complaint that he learned of the 2001 Transfer on July 26, 2013, at the deposition of Richard Speers (Complaint, Dkt. 10 at 82), and that he filed the action against Jane within the one year savings period.  Because the State Court Action was commenced less than one year after Scott claims he discovered the transfer, if Scott did not know

13

and could not reasonably have discovered the transfer before that date, Claim 1 was timely filed and Jane's UVTA Statute of Repose defense must fail.

No one denies that the original transfer of the WS/CBC Proceeds occurred in 2001 when Buddy placed those funds into the RJ Account. However, the record does not establish and the court cannot infer whether or not the 2001 Transaction was made with an intent to transfer ownership and control of the WS/CBC Proceeds, much less whether the transfer was made or received with the actual intent to hinder, defraud, or delay Scott. And no one can dispute that 2014 is more than four years after 2001. Therefore, in denying Jane's summary judgment motion on Claim 1, Judge Stephens must have decided that genuine issues of material fact were presented as to whether the State Court Action was filed within one year of discovery of the transfer, bringing it within the UVTA Statute of Repose. While it appears that Scott knew when he signed the Agreement that the funds went into Jane's RJ Account, the same facts were before Judge Stephens and he determined that an issue remained for trial. While this court might or might not have reached a different conclusion, the question is not whether this court agrees with the state court, but whether the state court decided the question. For purposes of its analysis of whether the law of the case doctrine applies, the court determines that Judge Stephens necessarily concluded that a question of fact exists with respect to whether Scott knew or could reasonably have discovered the transfer more than one year prior to filing the State Court Action, and thus the court must turn to the second prong of the law of the case analysis for Claim 1. As will be further discussed below, analysis of the enumerated exceptions to the law of the case doctrine does not provide this court with a sufficient basis to revisit and deviate from the Judge Stephens Order.

### 3.    Claim 6 – 2013 Fraudulent Transfer of WS/CBC Proceeds (Jane to Jane Trust)

In Claim 6, Scott asserts a 23.4(a)(1) Claim against Jane personally and as the trustee of the Jane Trust stemming from the 2013 Trust Transfer. The transfer he seeks to avoid is the transfer of the WS/CBC Proceeds from the TD Account into an account owned by the Jane Trust, also maintained at TD Ameritrade. It is undisputed that this transfer occurred on September 25, 2013. Complaint, Dkt. 10 at 83; Jane's Answer, Dkt. 10 at 194. Jane does not assert the UVTA Statute of Repose as a defense to Claim 6. *See* Jane's Answer, Dkt. 10 at 202–03.

Instead, Jane contends that because the UVTA Statute of Repose would block Claim 1, no underlying debt would exist to support a UVTA cause of action in Claim 6.  However, because Claim 1 survives for the reasons stated above, and other causes of action against her survive for the reasons stated below, this argument on Claim 6 must fail. And because Judge Stephens denied both parties' motions for summary judgment on Claim 6, he necessarily decided that a genuine issue of material fact existed regarding Jane's intent with respect to the 2013 Trust Transfer, which decision is now the law of the case. Claim 6 therefore will not be dismissed on Jane's motion, although it is subject to further review on other grounds for reasons stated below.

### 4.    Claim 9 – 2013 Fraudulent Transfer (Removal of Signatory Authority)

In Claim 9, Scott asserts a 23.4(a)(1) Claim against Buddy and Jane, stemming from the 2013 revocation of Buddy's signatory authority over Jane's TD Account. Like Claim 6, Jane does not contend that this alleged transfer is barred by the UVTA Statute of Repose. *See* Jane's Answer, Dkt. 10 at 202–03. Accordingly, in order for Scott to have prevailed as a matter of law before Judge Stephens on Claim 9, he was required to prove the two elements of a 23.4(a)(1) Claim,

specifically that (1) Buddy made a transfer to Jane's account by instructing her to revoke his signatory authority (2) with the intent to hinder, defraud, or delay Scott.

While it is undisputed that Buddy's signatory authority was removed from Jane's account on August 14, 2013, Jane argues that the revocation of signatory power does not constitute a "transfer" as defined by the UVTA as a matter of law. First Jane Memo, Dkt. 43 at 27. The court is unaware of whether or not this argument was presented to Judge Stephens. However, given that the assertion of an underlying debt under other claims survives, whether Jane made this argument in state court is immaterial: if she did, Judge Stephens necessarily determined that a genuine issue of material fact exists as to whether revocation of Buddy's signatory authority was or was not a sufficient change of rights to fall within the broad definition of a transfer under UVTA. Thus, the first prong of the law of the case doctrine is established.

### C.    Whether Compelling Circumstances Exist that Justify Departure from the Law of the Case

As detailed above, Judge Stephens' denials of both parties' motions for summary judgment on Claims 1, 6, and 9, and the issues necessarily decided thereby, are the law of the case, and those decisions "should continue to govern the same issues in subsequent stages in the same case." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009)). Moreover, the Judge Stephens Order denying partial summary judgment is interlocutory, and revisiting it is governed by Rule 54(b). *See Am. Canoe Ass'n*, 326 F.3d at 514. A court "may revise an interlocutory order under the same circumstances in which it may depart from the law of the case." *Carlson*, 856 F.3d at 325. Those circumstances exist where "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly

16

erroneous and would work manifest injustice." *Sejman*, 845 F.2d at 69 (quoting *EEOC v. Int'l Longshoremen's Ass'n*, 623 F.2d 1054, 1058 (5th Cir. 1980)).

This court has discretion to revisit interlocutory orders in the same case prior to entry of a final judgment, pursuant to Rule 54(b) (made applicable in this adversary proceeding by Rule 7054(a) of the Federal Rules of Bankruptcy Procedure).[7] However, "doctrines such as law of the case . . . have evolved as a means of guiding that discretion," *Am. Canoe Ass'n*, 326 F.3d at 515, and "the doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Christianson*, 486 U.S. at 816.

### 1.      Substantially different evidence

Neither party contends that new evidence or new facts exist that would support deviating from the law of the case in this instance, and the court is not aware of any new developments in this case since entry of the Judge Stephens Order that would warrant such a departure. Therefore, no basis exists under exception (1) for departing from the law of the case.

### 2.      Intervening change of controlling law

Jane maintains that the recent decision of the North Carolina Court of Appeals in *KB Aircraft Acquisition, LLC v. Berry*, -- N.C. App. --, 790 S.E.2d 559 (2016), *discr. rev. allowed*, 797 S.E.2d 3 (2017) (memorandum order), constitutes "an intervening change of controlling law" that would support variance from the law of the case with respect to Claims 1, 6, and 9. Jane's Reply Memo, Dkt. 59 at 3.

---

[7] "[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b).

The facts of *KB Aircraft* are fairly straightforward. In 2006, the plaintiff's predecessor-in-interest, Key Equipment Finance, Inc. ("Key") loaned approximately ten million dollars ($10,000,000.00) to BerryAir, LLC ("BerryAir"), an entity owned and controlled by the defendant, Jack M. Berry, Jr. ("Berry"), to purchase an aircraft for use in BerryAir's business. *KB Aircraft*, 790 S.E.2d at 561. As additional security for the loan, Berry executed a personal guaranty in favor of Key, and pledged to notify Key annually of his personal financial position. At the time the loan was made, Berry owned real estate in North Carolina (the "Property") worth approximately three million dollars ($3,000,000.00). Following BerryAir's defaults on the loan in 2008, on October 10 of that year Berry organized a new entity called 585 Goforth Road, LLC ("585"). Berry and his wife were its sole members. The same day he formed 585, Berry conveyed the Property to it via special warranty deed, with no consideration in support of the conveyance. In 2009, Berry submitted an annual personal financial statement to Key that disclosed that his personal real estate assets were now valued at only $353,355.00, and stated that he owned a 100% interest in 585, which he valued at $1,142,000.00. This statement was the first document given to Key that would have alerted it of Berry's sale of the Property to 585. *Id.* at 561–62.

Later, on September 30, 2010, Key sold and assigned all its rights under the loan and guaranty to the plaintiff, KB Aircraft Acquisition, LLC ("KBA"). KBA instituted legal action in Florida (where Berry lived) to collect on the loan and guaranty after the foreclosure sale of the aircraft left a deficiency of approximately ten million dollars ($10,000,000.00). *Id.* at 562–63 & 563 n.4. During the litigation, in December 2010, KBA conducted a title search on the Property and discovered the 2008 transfer from Berry to 585. *Id.* at 563. After securing a judgment against Berry for the deficiency in July 2013, KBA properly domesticated it in North Carolina. However, because the Property was no longer in Berry's name, KBA was unable to secure a lien on the

Property. KBA brought suit against Berry in North Carolina on December 2, 2013, alleging claims for relief under the UVTA. *Id.* Berry filed a motion for summary judgment, asserting that the KBA's claim was time-barred by the UVTA Statute of Repose, and his motion was granted. *Id.* at 563.

KBA appealed, and two questions of first impression were before the North Carolina Court of Appeals: first, the meaning of the word "transfer" as it appears in the UVTA Statute of Repose; and second, whether the UVTA Statute of Repose was in fact a statute of repose or a statute of limitations. *Id.* at 561. The court held that (1) the word transfer "refers to the date that the transfer actually occurred, and not the date that the fraudulent nature became apparent," *id.* at 564; and (2) that the UVTA Statute of Repose "operates as a condition precedent to [KBA's] claims." *Id.* at 570. The court of appeals therefore upheld the trial court's grant of summary judgment in favor of Berry, finding that KBA's claims were brought more than four years after the October 10, 2008 transfer and were not revived by the one year from discovery savings clause because "[t]he latest possible time when Plaintiff knew or reasonably should have known of the transfer of the Property was December 2010." *Id.* at 569.

Jane contends that *KB Aircraft* constitutes a change in controlling law that authorizes this court to depart from the law of the case as to Claims 1, 6, and 9. Specifically, she maintains that the opinion clarifies when a transfer takes place, establishing with clarity that it is the date of the actual transfer, and not discovery that the transfer may have been fraudulent in nature. However, any clarification in the law resulting from *KB Aircraft* will not help Jane in this case at the summary judgment phase regardless of the law of the case doctrine. First, the court does not read *KB Aircraft* as broadly as Jane urges. Second, because the court determines that *KB Aircraft* does not change

19

the outcome of Claim 1 with regard to the law of the case, Jane cannot prevail on her argument that Claims 6 and 9 are defeated by the failure of Claim 1.

In determining that the UVTA Statute of Repose was in fact a statute of repose, and not one of limitation, the appellate court expressly recognized that the UVTA Statute of Repose, as it applied to 23.4(a)(1) Claims "also includes a 'savings clause' providing that an action is not extinguished if brought within one year after the complaining party discovered or could have reasonably discovered it." *Id.* at 568 (citing N.C. Gen. Stat. § 39-23.9(1)). With respect to Claim 1, Jane contends that Scott specifically argued at the hearing before Judge Stephens that "the limitations period under [the UVTA Statute of Repose] does not begin to run until the discovery of the fraud or fraudulent nature of the transfer." Jane's Reply Memo, Dkt. 59 at 3. However, no transcript or other record of the exact argument made before Judge Stephens is part of the record presented to this court, and more importantly, Jane's interpretation of the holding of *KB Aircraft* is incorrect.

To the extent Scott was referring in his state court argument to the one year "savings clause" under the UVTA Statute of Repose, as it affects 23.4(a)(1) Claims, his assertion appears to be correct, as that portion of the UVTA was unaffected by *KB Aircraft*. Unlike Scott, the plaintiff in *KB Aircraft* brought claims under *both* North Carolina General Statutes § 39-23.4(a)(1) (which may be brought by a present or future creditor of a debtor) *and* North Carolina General Statutes § 39-23.5 (which may only be brought by a creditor "whose claim arose before the transfer was made or the obligation was incurred . . . ."). Because the plaintiff in *KB Aircraft* was a successor in interest to Key, it inherited Key's claims against Berry, which were in existence when the Property was conveyed to 585. Significantly, and of pivotal importance here, § 39-23.5 claims *do not* enjoy the benefit of a one year "savings clause." Instead, they must be brought "not later than

20

four years after the transfer was made or the obligation was incurred . . . ." N.C. Gen. Stat. § 39-23.9(2). This left the plaintiff in *KB Aircraft* in a conundrum: the only way to preserve the 23.5 claims was to argue that the "transfer," as used in § 39-23.9(2) (and *not* in § 39-23.9(1), which is applicable in the instant case), occurred at the time its fraudulent nature was discovered, not when it occurred. The court rejected that argument as contrary to the plain language of the statute.

A careful reading of *KB Aircraft* reveals that the court there rejected a proposed broadening of North Carolina General Statutes § 39-23.9(2), which is inapposite to the present case because Scott has not alleged a claim under Section 39-23.5 or Section 39-23.4(a)(2). Instead, Scott has alleged several § 39-23.4(a)(1) claims that are governed by § 39-23.9(1), which includes a one year "savings clause." Judge Stephens necessarily determined that a genuine issue of material fact remained as to whether the transfer was or could have been discovered only within the year prior to the action being filed such that the claim would be timely under the one year "savings clause." Accordingly, *KB Aircraft* does not represent a significant change in controlling law that would justify this court's departure from the law of the case.[8]

With respect to Claims 6 and 9, Jane seeks summary judgment because those claims are dependent upon the survival of Claim 1. Because the court is not revisiting the state court's denial of summary judgment on Claim 1, Jane's motion for summary judgment on Claims 6 and 9 on that basis must fail. Second, *KB Aircraft* did not enlarge or abridge the definition of "transfer" as it relates to what transactions, acts, or omissions constitute a "transfer" under N.C. Gen. Stat. § 39-23.1(12), so *KB Aircraft* is not instructive regarding Jane's argument that Claim 9, or the

---

[8] The court also notes that *KB Aircraft* is currently on appeal to the North Carolina Supreme Court. *See* 797 S.E.2d 3. Thus, it is unclear to what extent the conclusions of the court of appeals in *KB Aircraft* will continue to represent "controlling law" following the decision of the North Carolina Supreme Court. If the court believed *KB Aircraft* to be more apposite to Jane's claims, it might be inclined to exercise permissive abstention over Claim 1 "in the interest of comity with State courts or respect for State law . . . ." 28 U.S.C. § 1334(c)(1).

revocation of Buddy's signatory authority on her account, was not a transfer under the UVTA. *KB Aircraft* involved the conveyance of real property that unquestionably was a transfer.

The court concludes that *KB Aircraft* does not represent a change in controlling law with respect to Claims 1, 6, or 9. Jane has not met her burden of demonstrating an intervening change in controlling law with respect to those claims, and the court declines to depart from the law of the case on that basis.

### 3.    Clear error

Finally, neither party has asserted that any finding in the Judge Stephens Order is "clearly erroneous" or would "work manifest injustice." Although this court may or may not have ruled differently on Claims 1, 6, and 9 at summary judgment if before it in the first instance, that is not the test to be applied. "A prior decision does not qualify for this third exception by being 'just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (quoting *Bellsouth Telesensor v. Info. Sys. & Networks Corp.*, Nos. 92-2355 & 92-2437, 1995 WL 520978, at *5 n.6 (4th Cir. Sept. 5, 1995)). Indeed, a party seeking to depart from the law of the case on the basis of a clearly erroneous decision faces a "high burden" and must demonstrate that the prior decision was "dead wrong." *Id.* at 195 (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)). This court is a co-equal court with the General Court of Justice for the State of North Carolina, and is not sitting in appellate review of the Judge Stephens Order. There is nothing in the Judge Stephens Order that appears "dead wrong" and, at any rate, this court is far more inclined to be deferential to an order from a coordinate court than it might be with its own prior order.

22

Accordingly, this court finds no compelling circumstances to depart from the Judge Stephens Order as the law of the case. For this reason, the court declines to consider Jane's motion for summary judgment with respect to Claims 1, 6, and 9, and the motion is hereby DENIED with respect to those claims.

Having addressed Jane's motion for summary judgment on Claims 1, 6, and 9, the court will now turn to the remaining claims for which she has moved for summary judgment, none of which have been previously decided in this case.

## III.    CLAIM 2 – FRAUDULENT TRANSFER OF THE TOP PROPERTIES

Both Scott and Jane have moved for summary judgment on Claim 2. Scott has asserted a 23.4(a)(1) Claim against Buddy individually, against Jane as trustee of the Jane Trust, and against the Jane Trust, stemming from the transfers of the two TOP Properties from Buddy to the Jane Trust in late 2013 and early 2014.[9] It is undisputed that both TOP Properties were transferred from Buddy to Jane as trustee of the Jane Trust. It is further undisputed that the TOP Properties were sold by Buddy to the Jane Trust for a combined total of approximately $200,000. In order for Scott to be entitled to judgment as a matter of law on Claim 2 against Buddy, he must show that there is no genuine issue of material fact that (1) Buddy transferred the TOP Properties to the Jane Trust; and (2) that he did so with the actual intent to hinder, defraud, or delay Scott.

Further, Jane has pled the affirmative defense of being a "person that took in good faith and for a reasonably equivalent value" pursuant to North Carolina General Statutes § 39-23.8(a). Jane's Answer, Dkt. 10 at 202. As transferee, Jane "has the burden of establishing good faith and

---

[9] Specifically, and as recited in the background facts, 3615 TOP was sold by Buddy to the Trust on December 23, 2013, and 3613 TOP was sold by Buddy to the Trust on January 7, 2014.

the reasonable equivalence of the consideration exchanged." *Estate of Hurst ex rel Cherry v. Jones*, 230 N.C. App. 162, 176, 750 S.E.2d 14, 24 (2013) (quoting N.C. Gen. Stat. § 39-23.8(a) cmt. 1).

It is undisputed that the TOP Properties were transferred to the Jane Trust by Buddy, but Jane has conceded at a hearing on this matter that the assets of the Trust are the assets of the bankruptcy estate.[10]  The parties dispute whether Buddy made the transfer with the actual intent to hinder, defraud or delay Scott, and if so whether Jane, as the trustee of the Jane Trust, took title to the TOP Properties in good faith.

"Because a debtor is not likely to testify that he had the requisite intent to defraud creditors, the intent to hinder, delay, or defraud can be inferred from extrinsic evidence and the presence of badges of fraud." *In re Clarkson*, 387 B.R. 882, 887 (Bankr. S.D. Fla. 2008). As discussed above, the UVTA "provides a non-exhaustive list of badges of fraud to be considered in determining intent under subsection (a)(1)." *Id.* at 889 (citing N.C. Gen. Stat. § 39-23.4(b)).[11] "When analyzing

---

[10] At the hearing on the cross motions for summary judgment, Mr. Janvier, counsel for Jane, hinted that there was no meaningful distinction between Jane and the Jane Trust:

> The court: "'We' being limited to Jane"
> Mr. Janvier: "Jane, yes"
>  The court: "or Jane and Jane's Trust?"
> Mr. Janvier: "Your honor I don't recognize much of a distinction, the trust is not an asset protection device
> it is a revocable trust…"
> The court: "Alright, so you're not using the trust as a shield, for that purpose?"
> Mr. Janvier: "No, I'm not."

June 6, 2017 H'rg Audio, Dkt. 76 at 00:44:15 – 00:44:35. However, the court is unaware of any stipulation or admission regarding whether Jane and the Jane Trust exist as separate entities, and considers this a factual issue that remains to be established, one way or the other, at trial.

[11] The thirteen most common factors that a court should consider to determine whether a transfer was made with the actual intent to hinder, defraud, or delay creditors are listed in the statute:

(1)    The transfer or obligation was to an insider;
(2)    The debtor retained possession or control of the property transferred after the transfer;
(3)    The transfer or obligation was disclosed or concealed;
(4)    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5)    The transfer was of substantially all the debtor's assets;

these factors to make a determination of the debtor's intent, a court should evaluate the entirety of the circumstances surrounding the transaction at issue and 'may appropriately take into account all indicia [negating] as well as those suggesting fraud.'" *In re Schofield-Johnson, LLC*, 462 B.R. 539, 543 (Bankr. M.D.N.C. 2011) (quoting N.C. Gen. Stat. § 39-23.4(b) cmt. 6).

While these badges of fraud may be considered by the court in evaluating the debtor's mental state, "a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 353 (4th Cir. 2007) (quoting *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (10th Cir. 1987)). In *French*, the bankruptcy court granted a creditor's motion for summary judgment on claims arising under 11 U.S.C. § 727(a)(4)(A), and in so doing, "made credibility determinations on [two witnesses'] proffered testimony, and specifically rejected their testimony as unreliable." *French*, 499 F.3d at 354. Although the district court affirmed the bankruptcy court's grant of summary judgment, the United States Court of Appeals for the Fourth Circuit reversed, concluding that "[i]n the summary judgment context, a court is simply not empowered to make such determinations [of credibility]." *Id.*

---

(6)     The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred;

(11)    The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor;

(12)    The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and

(13)    The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. Gen. Stat. § 39-23.4(b).

Although *French* involved a § 727(a)(4)(A) claim, and not a 23.4(a)(1) Claim, *French* is instructive because both claims require the claimant to successfully demonstrate actual intent on the part of the debtor. *Compare* N.C. Gen. Stat. § 39-23.4(a)(1) ("[w]ith intent to hinder, delay, or defraud any creditor of the debtor . . . ."), *with* 11 U.S.C. § 707(a)(4)(A) ("the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account . . . ."). This court is exceedingly hesitant to evaluate the credibility of conflicting affidavits or other testimony and evidence of state of mind at the summary judgment stage. *See Wells Fargo Advisors, LLC v. Nawroz (In re Nawroz)*, No. 10-20633-BFK, AP No. 11-01186, 2011 WL 4900035, at *4 (Bankr. E.D. Va. Oct. 14, 2011) ("[T]he Court does not believe it appropriate to make a determination as to the Debtor's subjective intent on a motion for summary judgment.").

On the other side of the coin, Jane has moved for summary judgment on Claim 2, asserting that "[b]oth Buddy and Jane have testified that sales were made for non-fraudulent purposes." First Jane Memo, Dkt. 43 at 18. Jane has proffered her own deposition and affidavit testimony, as well as Buddy's deposition and affidavit testimony, which she contends establish that the purpose of the transfers of the TOP Properties was to help Buddy pay his legal expenses related to the ongoing 2011 Lawsuit. *Id.* at 18.

Scott, likewise, has moved for summary judgment on Claim 2, asserting that Jane's deposition testimony establishes her actual intent to hinder, delay, or defraud him with respect to the TOP Properties. First Scott Memo, Dkt. 45 at 14. Specifically, Scott refers to the Condensed Transcript of the Testimony of Jane Hoch, dated June 30, 2015 (the "Jane Deposition"), Dkt. 12 at 94–142, to show that Jane held all of Buddy and Jane's accounts in her name "because [Buddy] had the judgment against him and it was to protect our assets." Jane Deposition, Dkt. 12 at 103.

26

In addition, both parties have pointed to the presence or absence of badges of fraud as proof that the transfer of the TOP Properties was or was not fraudulent. Jane argues that the TOP transfers were not intended to hinder, delay, or defraud Scott because the TOP Properties were sold "for fair market value," First Jane Memo, Dkt. 43 at 19, and that because the sales were "publicly disclosed (by recording with the Register of Deeds)," the transfers could not have been fraudulent, pointing to factors (3) and (8), that the transaction was not concealed, and the transaction was for reasonably equivalent value. *Id.*

Scott meanwhile contends that factors (1), (4), (9), (10), and (12) weigh in favor of finding that Buddy transferred the TOP Properties with the intent to hinder, delay or defraud him. Specifically, Scott points out that the transfer was to an insider, was made in close proximity to the trial in the 2011 Lawsuit, that Buddy was insolvent at the time of the transfer, that Buddy no longer had assets to help pay his debts following the transfer, and that the transfer was not for reasonably equivalent value, because the money was redirected back to Buddy by Jane. First Scott Memo, Dkt. 45 at 15.

The parties have forecast evidence that, in Jane and Buddy's case, would show a valid purpose and fair value for the TOP Properties transfers, and in Scott's case would demonstrate a pattern and practice of moving assets into Jane's name to protect them from Buddy's creditors, further accentuated by use of the Jane Trust. Both parties have cited several badges of fraud weighing in their respective favor. However, in its capacity as the trier of fact, the court has not heard testimony and is not in a position to weigh or evaluate the credibility of the proffered testimony of any witness. At the summary judgment stage, "[i]t is not our job to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that seem hard to believe." *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991)

27

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Neither party has shown that there is no genuine issue of material fact regarding Buddy's intent when the TOP Properties were transferred, or whether Jane's affirmative defense of being a good-faith transferee for value might succeed. Neither Jane nor Scott is entitled to summary judgment on Claim 2.

## IV.    CLAIM 3 – FRAUDULENT TRANSFER OF THE PICTOU ROAD PROPERTY

In Claim 3, Scott asserts a 23.4(a)(1) Claim against both Buddy and Jane individually, against the Jane Trust, and against Jane as the trustee of the Jane Trust, in connection with the transfer of the Pictou Road Property from Buddy and Jane, as husband and wife, to the Jane Trust on September 27, 2013. It is undisputed that the Pictou Road Property was held by Buddy and Jane as tenants by the entirety prior to the transfer, and that no consideration was received by the Jane Trust, nor by Jane and Buddy individually, related to the transaction. Jane moved for summary judgment on Claim 3 on the basis that there was no "transfer" under the UVTA as a matter of law because the Pictou Road Property was held by Buddy and Jane as tenants by the entirety.

At the hearing held on June 6, 2017, counsel for Scott acknowledged that Scott had not briefed any opposition to Jane's motion for summary judgment on Claims 3 and 5, stating:

> Mr. Parsons: "We can save you some time on that. We have not briefed in response to the count 3 or count 5 and do not wish to be heard in opposition on that, so, I think that may save us all some time."
> The Court: "So you're conceding summary judgment on 3 and 5 as to Jane?"
> Mr. Parsons: "Yes sir."

Audio of June 6, 2017 Hr'g, Dkt. 77 at 00:00:59 – 00:01:22.

North Carolina General Statutes § 39-23.1(2) expressly excludes from the definition of asset "[a]n interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant." *See Dealer Supply Co. v. Greene*, 108 N.C. App. 31, 34–35, 422 S.E.2d 350, 352–53 (1992). Because Scott has conceded that Jane

28

is entitled to summary judgment on Claim 3, and because there is no genuine issue of material fact as to any claim Scott has made against Jane with respect to the Pictou Road Property, Jane's motion for summary judgment on Claim 3 will be granted. Further, the court will *sua sponte* grant summary judgment on Claim 3 as to Buddy, because Scott cannot also prove, as a matter of law, that the Pictou Road Property was subjected to a "transfer" under the UVTA.

## V.   CLAIM 5 – EXTENSION OF LIABILITY FOR CLAIMS AGAINST BUDDY AND JANE TO THE JANE TRUST

In Claim 5, Scott asserts what the court will construe as a request for a declaratory judgment that both Jane and Scott are "settlors" of the Jane Trust, as that term is defined by North Carolina General Statutes § 36C-1-103(17). However, and as detailed above, Scott abandoned his opposition to Jane's summary judgment motion on Claim 5. For this reason, the court will grant Jane's motion for summary judgment on Claim 5.[12]

## VI.   SCOTT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 4, 7, AND 8

Scott has moved for summary judgment on Claims 2, 4, 7, and 8. The court addressed the cross-motions with respect to Claim 2 in Part III of this Order. In Claim 4, Scott asserts a common law fraud claim against Buddy, alleging that Buddy "purposely made false representations to [Scott] regarding where the WS/CBC sale proceeds distributed to [Buddy] were held." Complaint, Dkt 10 at 90. In Claim 7, he states a breach of contract claim against Buddy stemming from an obligation purportedly memorialized in the Agreement. In Claim 8, Scott asserts a 23.4(a)(1) Claim against Buddy and Jane arising from the transfer of the Vehicle on February 19, 2014.

---

[12] In granting Jane's motion for summary judgment on both Claim 3 and Claim 5, the court expressly declines to make any conclusions of law as either may relate to Jane, her bankruptcy estate or a successor interest such as a bankruptcy trustee. Therefore, the grant of summary judgment on Claims 3 and 5 under this Order shall not be construed in any way to preclude any other party from raising such a claim against Jane or Buddy under these facts at any point in the future.

A.    **Claim 4 – Fraud as to Buddy**

In order to successfully recover under a theory of common law fraud (Claim 4), a plaintiff must prove five elements: "1) a false representation or concealment of a material fact, 2) reasonably calculated to deceive, 3) made with intent to deceive, 4) which does in fact deceive, and which 5) results in damage to the injured party." *Town of Belhaven v. Pantego Creek, LLC*, -- N.C. App. --, 793 S.E.2d 711, 718 (2016) (quoting *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 39, 626 S.E.2d 315, 321 (2006)). Further, "any reliance on the allegedly false representations must be reasonable." *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007) (citing *Johnson v. Owens*, 263 N.C. 754, 757, 140 S.E.2d 311, 313 (1965)). "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Forbis*, 361 N.C. at 527, 649 S.E.2d at 387 (citing *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 225, 513 S.E.2d 320, 327 (1999)).

Scott contends that "it is undisputed that Buddy Hoch made false representations and concealed the fact that he did not own the investment account into which the WS/CBC Proceeds he converted from Plaintiff were deposited." First Scott Memo, Dkt. 45 at 20. Buddy concedes that he made the statement that the WS/CBC Proceeds were held in a personal account controlled by him (Buddy's Memo, Dkt. 48 at 6), but argues that Scott could not have reasonably relied on this statement even if it was false. It is undisputed that Buddy deposited the WS/CBC Proceeds into Jane's RJ Account "in or around January, 2001." Def. Arthur E. Hoch's Resps. and Objs. to Pl. Scott M. Hoch's First Set of Interrogs., Dkt. 12 at 65. However, the parties do not agree on when Scott knew or reasonably should have known that the WS/CBC Proceeds were in an account in fact owned by Jane, not by Buddy.

30

When construing the proffered evidence in the light most favorable to Buddy, the non-movant, the court concludes that a reasonable factfinder could determine that Scott had actual or inquiry notice of the whereabouts of the WS/CBC Proceeds in Jane's RJ Account years before bringing the instant action, and that Scott might not have reasonably relied on the subsequent statements by Buddy. No showing has been made by either party regarding the effect of the tolling agreements or the judgment of the 2011 Lawsuit on this claim, and in any event Buddy has not moved for summary judgment. Accordingly, Scott has failed to demonstrate that there is no genuine issue of material fact and that he is entitled to judgment on Claim 4 as a matter of law, and summary judgment will be denied.

**B.** **Claim 7 – Breach of the Agreement**

In order to recover in a breach of contract action, the plaintiff must show the "(1) existence of a valid contract and (2) breach of the terms of that contract." *S. Shores Realty Servs., Inc. v. Miller*, -- N.C. App. --, 796 S.E.2d 340, 348 (2017) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)).

Scott contends that Buddy was required to notify him "before transferring any money out of Jane's account at Raymond James." Agreement, Dkt. 10 at 54. Despite his inconsistent testimony,[13] for purposes of this claim Scott appears to admit the existence and binding nature of the Agreement. *See* Buddy's Answer, Dkt. 10 at 178–79; Complaint, Dkt. 10 at 81–82. However, Scott has not made clear what terms of the Agreement were breached and when, and whether the relief sought has already been granted in the 2011 Lawsuit. Buddy has not moved for summary

---

[13] *See supra* note 1.

judgment. Because there are genuine issues of material fact, Scott is not entitled to summary judgment on Claim 7 and his motion will be denied.

### C.    Claim 8 – Transfer of the Vehicle

In order for Scott to show he is entitled to judgment as a matter of law on Claim 8, he must demonstrate that there is no genuine issue of material fact regarding (1) Buddy and Jane transferring the Vehicle and (2) doing so with the intent to hinder, defraud, or delay Scott.

It is undisputed that the Vehicle was sold on February 19, 2014 from Buddy and Jane as joint owners to CarMax for $21,450.44. First Scott Memo, Dkt. 45 at 10; Jane's Opposition Memo, Dkt. 49 at 5, 15–16. Further, neither party disputes that CarMax was a good faith purchaser for value. Rather than the initial transfer to CarMax, the subsequent transfer of all (rather than one-half) of the net sale proceeds to Jane resulting in a new car titled solely in her name is at issue.[14] Scott claims that Jane and Buddy's fraudulent intent in the second part of this transaction (the proceeds being used to buy only Jane a new car) is evidenced by several of the badges of fraud contained in North Carolina General Statutes § 39-23.4(b), while Jane maintains that Scott cannot show fraudulent intent. Thus, disputed issues of material fact regarding actual intent to hinder, delay, or defraud Scott are presented that require further testimony, fact finding and weighing of the evidence. Neither party is entitled to summary judgment on Claim 8.

### VII.    STANDING TO PURSUE FRAUDULENT TRANSFER CLAIMS WHERE JANE IS TRANSFEROR

Even though Jane is only entitled to summary judgment with respect to Claims 3 and 5 for the reasons stated above, in this removed action the court, on its own recognizance, must review Scott's surviving claims for standing and attendant subject-matter jurisdiction. Claims for

---

[14] Scott did not actually plead entitlement to relief on this basis, *see* Complaint, Dkt. 10 at 93–94.

fraudulent transfers under state law, such as those under UVTA in North Carolina, can only be made in bankruptcy court through 11 U.S.C. § 544. Only a bankruptcy trustee has standing to bring an action to avoid prepetition fraudulent transfers by a debtor, *see* 11 U.S.C. §§ 544 and 548, except where, as here, a chapter 11 debtor-in-possession is in place. *See* 11 U.S.C. § 1107(a) (conferring upon the chapter 11 debtor-in-possession nearly all of the rights and duties of a chapter 11 trustee); *In re Dawnwood Props./78*, 231 B.R. 167, 174 (S.D.N.Y. 1999) ("The [bankruptcy] code gives the trustee the *exclusive* right to prosecute any claim held by a bankrupt estate.") (quoting *Honigman v. Comerica Bank* (*In re Van Dresser Corp.*), 128 F.3d 945, 947 (6th Cir. 1997)). As a result, "[a]bsent evidence that the trustee cannot be relied upon to assert such claims, claims to avoid preferential transfers may not be brought by creditors." *Nangle v. Lauer*, 98 F.3d 378, 388 (8th Cir. 1996).[15] In effect, only the trustee or debtor-in-possession has standing to pursue such fraudulent transfer actions. *See, e.g.*, *Nat'l Am. Ins. v. Rupert Landscaping*, 187 F.3d 439 (4th Cir. 1999); *Thomas v. Causey*, 519 B.R. 144 (Bankr. M.D.N.C. 2014).

Concerned about standing from the plain language of the allegations in the Complaint, after the hearing on the cross-motions for summary judgment, the court requested the parties to file a

> brief, position paper, or stipulations, on the issue of whether or not the operative complaint contains allegations of transfers *by* the debtor, Marilyn[n] Jane Hoch, and, if so, the impact of those allegations on the nine asserted causes of action and the effect if any on pending motions in the case.

Order Regarding Status Conference, Dkt. 81 at 1.

In his brief filed pursuant to that order, Scott failed to address or alleviate any of the court's concerns regarding standing. He merely states, without legal analysis, that the Complaint contains

---

[15] While *Nangle* is a preference action under § 547, the conferring authority under § 544 applies equally to transfers under 547 and 548.

"no allegations or evidence that Jane Hoch transferred assets to Buddy Hoch that would be recoverable by the bankruptcy estate and for which Plaintiff does not have standing to pursue." Scott Supplemental Brief, Dkt. 85 at 3. Scott's supplemental brief entirely misses the mark: whether *Buddy* was a transferee of Jane's has no bearing on whether any fraudulent transfer action is the property of the bankruptcy estate. *See* 11 U.S.C. § 544(b) (empowering the trustee to exercise the rights of a creditor holding an allowed unsecured claim to avoid "***any transfer of an interest of the debtor in property*** . . . that is voidable under applicable law . . . .") (emphasis added). The plain language of the Complaint specifies in several instances that *Jane* made the subject transfers. The court must therefore examine each surviving cause of action specifying an allegation of a transfer by Jane (Claims 6, 8, and 9) to determine if Scott has standing despite his "Jane transfer" allegations.

Claim 6 addresses an alleged transfer of the WS/CBC Proceeds by Jane to the Jane Trust. No allegation of a transfer by Buddy to any entity is alleged in Claim 6. It cannot be disputed that Jane is a debtor under the Bankruptcy Code as a result of filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 15, 2016; that the TD Account containing the WS/CBC Proceeds was held in a brokerage account at TD Ameritrade prior to September 27, 2013; and that Jane transferred the contents of the TD Account to a new account at TD Ameritrade held in the name of the Jane Trust on September 27, 2013. Absent Jane's transfer of the TD Account to the Jane Trust, the TD Account and its contents would have become property of the estate. *See* 11 U.S.C. § 541(a). In fact, Jane concedes that assets of the Jane Trust are assets of the bankruptcy estate. Scott is not a trustee in Jane's bankruptcy case, and therefore lacks standing to pursue Claim 6 against Jane. Because Scott lacks standing to pursue Claim 6, the court lacks subject-matter jurisdiction over Claim 6 as expounded by him and Claim 6 must be dismissed.

34

Dismissal of Claim 6 on these grounds is consistent with the law of the case ruling, because, unlike the General Court of Justice for the State of North Carolina, this court lacks general subject-matter jurisdiction over that cause of action. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute."). Further, this court has "the duty to ascertain sua sponte the standing of a party under the Constitution's grant of power to the federal courts to resolve 'cases' and 'controversies.'" *Marcus Cable Assocs., L.L.C. v. City of Bristol*, 237 F. Supp. 2d 675, 677 n.2 (W.D. Va. 2002) (citing U.S. Const. art. III). Finally, if Scott contends he has standing to pursue Claim 6 before this court, he "must allege and, when challenged, must demonstrate the federal court's jurisdiction over the matter." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014) (quoting *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008)). This court instructed the parties to brief the issue, and Scott's brief responding to the court's Order fails to demonstrate the existence of jurisdiction for this court over Claim 6 when brought by a putative creditor of Jane, the debtor-in-possession.

Similarly, the court lacks subject-matter jurisdiction over Claim 8 as expounded by Scott. Paragraph 84 of the Complaint states that Jane, along with Buddy, transferred the Vehicle to a third party with the intent to hinder, delay, or defraud Scott. Although virtually no facts are alleged in the Complaint, apparently the Vehicle was jointly owned and a new automobile was subsequently obtained solely in the name of Jane, which Scott maintains is part of a plan to hinder, delay, or defraud him. That may or may not be, but regardless only a trustee (or debtor-in-possession) can bring an action founded on a transfer by a debtor. Scott cannot. As a result, Claim 8 must also be dismissed as to Jane for lack of subject-matter jurisdiction.

35

Finally, Claim 9 pertains to the removal of Buddy's signatory power over the WS/CBC Proceeds in the TD Account in August 2013. Such activity could only be physically accomplished by Jane, but there remains a material issue of disputed fact regarding whether Jane made this "transfer" on her own, or was acting under Buddy's direction and control. Jane maintains that she acted alone and that the mere removal of Buddy's account signature rights did not reach the level of a "transfer" under the bankruptcy law because at most all that happened was a transfer to herself. A true transfer to oneself will not support an action under chapter 5 of the Bankruptcy Code. *See, e.g.*, *Ivey v. First Citizens Bank & Tr. Co. (In re Whitley)*, 848 F.3d 205 (4th Cir. 2017), *petition for cert. filed*, (U.S. May 5, 2017) (No. 16-1330). Scott meanwhile contends that at all pertinent times prior to August 2013 Buddy actually owned and controlled the contents of the TD Account through his spouse Jane, who only acted as his straw-person, and that by instructing Jane to remove him as part of a scheme or conspiracy to hinder, delay, or defraud a creditor, a "transfer" for UVTA and chapter 5 purposes was actually made by Buddy.

Because (as analyzed above) there is a disputed issue of material fact as to whether Jane was the transferor, or was merely acting as Buddy's agent, this court is left with the presumption that the state court found (for summary judgment purposes only) that the transfer at issue and to be tried is by Buddy to Jane. Therefore, for summary judgment purposes, Claim 9 survives; however, should Jane prove at trial that she was the true transferor (not Buddy), Claim 9 will be property of the estate and Scott will lack standing to pursue it. Because neither party is currently able to show whether an actual "transfer" of the account occurred without presentation of evidence, Claim 9 cannot be dismissed for lack of standing at this time.

As a result, Claims 6 and 8 are dismissed as to Jane and Claim 9 survives. The court makes no findings of fact or conclusions of law with respect to any of these claims other than that any

36

cause of action stated in Claims 6 and 8 as to Jane is property of the estate and that Scott lacks standing to pursue either against Jane. In any event, the basis for dismissal is solely the lack of standing, not because the court is convinced Claims 6 or 8 (and hypothetically Claim 9) have or lack substantive merit. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits.").

## CONCLUSION

For the foregoing reasons, the Jane Motion is GRANTED in part, with respect to Claims 3 and 5, and DENIED with respect to all other claims. The Scott Motion is DENIED. Summary judgment is GRANTED in favor of Buddy as to Claim 3. Claims 6 and 8 are DISMISSED without prejudice for lack of subject-matter jurisdiction.

## END OF DOCUMENT