SO ORDERED.

SIGNED this 25 day of January, 2018.



_Joseph N. Callaway_
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

MARILYNN JANE HOCH,

      Debtor

--------------------------------------------------------------

SCOTT M. HOCH,
            Plaintiff

   v.

ARTHUR E. HOCH, individually, MARILYNN J.
HOCH, individually, MARILYNN J. HOCH as
TRUSTEE of the MARILYN JANE HOCH
REVOCABLE TRUST, the MARILYN JANE
HOCH REVOCABLE TRUST, MARILYNN J.
HOCH as TRUSTEE of the MARILYNN JANE
HOCH REVOCABLE TRUST, the MARILYNN
JANE HOCH REVOCABLE TRUST, MARILYNN
J. HOCH as TRUSTEE of the JANE HOCH
REVOCABLE TRUST, and the JANE HOCH
REVOCABLE TRUST,
            Defendants.

--------------------------------------------------------------

**Case No.:**
**16-03678-5-JNC**
**Chapter 11**

**Adversary Proceeding No.:**
**16-00123-5-JNC**

## MEMORANDUM OPINION

      This Adversary Proceeding represents the culmination of a greater than sixteen year family

dispute. It was tried on December 11, 12, and 13 in Greenville, North Carolina. Kimberly M.

Marston and Gary S. Parsons represented the plaintiff, Scott M. Hoch ("Scott"). Ryan J. Adams appeared on behalf of defendant Marilynn Jane Hoch ("Jane") individually and the Marilynn Jane Hoch Revocable Trust (the "Jane Trust"). William P. Janvier appeared for Jane in her capacity as debtor-in-possession in the chapter 11 bankruptcy case and on behalf of the bankruptcy estate. Sean G. Delaney appeared on behalf of defendant Arthur E. Hoch ("Buddy").[1]

## JURISDICTION

This court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina. The matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), which this court has the jurisdiction to hear and determine. To the extent this matter is not a core proceeding, all parties have expressly consented to the court's exercise of jurisdiction pursuant to 28 U.S.C. § 157(c)(2).[2]

## PROCEDURAL HISTORY

This controversy began with a disagreement between Scott and Buddy concerning the proper distribution of net sale proceeds originating from the 2001 sale of property owned by their partnership (the "WS/CBC Property"). Scott contended that Buddy distributed to himself too great a share of the sale proceeds (the "WS/CBC Proceeds") under the partnership agreement and other contracts.  After years of discussions and the execution of multiple tolling agreements, on July 27, 2011, Scott sued Buddy to recover his perceived rightful share of the WS/CBC Proceeds in an action filed in the Wake County, North Carolina, Superior Court (the "State Court"), Case No. 11-

---

[1] Because three of the parties share the same surname, the court refers to them by their first names to avoid confusion. No disrespect is intended.
[2] *See* Final Pretrial O, AP D.E. 100 at 1.

2

CVS-11692 (the "2011 Lawsuit").[3] Buddy counterclaimed to assert his alleged ownership rights in other assets. After the grant of partial summary judgment by the State Court for Buddy regarding his rights in two townhouses as discussed below, the 2011 Lawsuit proceeded to trial.  The jury ultimately agreed that Buddy had overpaid himself from the WS/CBC Proceeds to Scott's detriment. Accordingly, on February 25, 2014, the State Court issued a judgment in favor of Scott against Buddy in the principal amount of $364,269.00 (the "2011 Judgment"), plus interest at the North Carolina legal rate of eight percent (8%) per annum ($79.96 per diem) from the date of wrongful distribution. As of December 5, 2017, costs and interest of $441,951.23 had accrued for a total judgment of $806,220.23.[4]

Frustrated in his efforts to collect the 2011 Judgment, Scott sued Buddy, Jane, and the Jane Trust in State Court on July 22, 2014 in an action designated Case No. 14-CVS-9568 (the "2014 Lawsuit"). In it, Scott sought to recover and set aside various allegedly fraudulent transfers made by Buddy to Jane and/or the Jane Trust, and by Jane and/or the Jane Trust to Buddy and others. Scott amended the complaint in the 2014 Lawsuit twice, and the parties proceeded to trial in this forum based on allegations contained in the Second Amended Complaint filed October 1, 2015 (AP[5] D.E. 10 at 79–171; the "Complaint").

The Complaint asserts nine (9) causes of action against Buddy, Jane, and/or the Jane Trust. Prior to final adjudication of the 2014 Lawsuit in State Court, Jane filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 15, 2016 (the "Petition Date"). The 2014

---

[3] Scott and Buddy executed a number of tolling agreements after the inception of the dispute, preserving each party's claims against the other notwithstanding the passage of nearly ten (10) years between the date of the sale of the WS/CBC Property and the initiation of the 2011 Lawsuit.

[4] Abstract of J., Pl.'s Ex. 65 at 2.

[5] Unless otherwise noted, references to "BR D.E." are references to a docket entry in the underlying bankruptcy case of Marilynn Jane Hoch, 16-03678-5-JNC, and references to "AP D.E." are references to a docket entry in the instant adversary proceeding, AP No. 16-00123-5-JNC.

Lawsuit was removed from State Court by Jane the same day (AP D.E. 1) pursuant to 28 U.S.C. § 1452(a) and became this adversary proceeding. No motion for remand or request for abstention was filed. The parties agreed to proceed with the 2014 Lawsuit in the bankruptcy court.[6]

Scott and Jane (but not Buddy) filed cross-motions for summary judgment.[7] After determination of those motions, five (5) causes of action in the Complaint survived for trial.[8] For clarity, the court retains the respective number of each cause of action as appears in the Complaint, summarized as follows:

A. First Cause of Action: Fraudulent transfer of the WS/CBC Proceeds (from Buddy to Jane in 2001);
B. Second Cause of Action: Fraudulent transfer by Buddy to the Jane Trust of two townhomes (the "TOP Properties");
C. Fourth Cause of Action: Fraud by Buddy only;
D. Seventh Cause of Action: Breach of contract as to a writing signed by Scott and Buddy dated September 27, 2001 (the "2001 Agreement"); and
E. Ninth Cause of Action: Fraudulent transfer by Buddy to Jane (or the Jane Trust) regarding revocation of his signatory authority on an account that contained the WS/CBC Proceeds.

## FACTUAL FINDINGS

Based on the testimony at trial, the stipulations of the parties, the exhibits admitted into evidence, and the undisputed facts established in the pleadings and discovery, the court makes the following findings of fact:

Buddy and Scott are brothers.[9] Buddy and Jane have been married for more than forty-seven years.[10] Cliff Benson, a friend and business acquaintance of Scott and Buddy, owned a retail

---

[6] *See* Final Pretrial O, AP D.E. 100 at 1; Pl.'s Rule 9027 Statement, AP D.E. 5 at 2.
[7] Jane's Motion for Summary Judgment (AP D.E. 43) and Scott's Motion for Summary Judgment (AP D.E. 44) were filed on February 2, 2017.
[8] Causes of Action 3, 5, 6, and 8 were dismissed or otherwise adjudicated by the Order Allowing in Part and Denying in Part Cross-Motions for Summary Judgment, AP D.E. 89 at 37.
[9] Test. of Buddy Hoch, December 11, 2017 Hr'g Audio at 00:24:38 – 00:24:42.
[10] *Id.* at 00:25:19 – 00:25:40.

builders supply store and lumberyard in Winston Salem, North Carolina, and was in need of operating cash.[11] On December 21, 1990, Buddy, Scott, and David H. Stevens formed a partnership named "WS/CBC Properties"[12] to purchase the lumberyard real estate from Mr. Benson and leased it back to his company, Carolina Builders Corporation.[13] On January 8, 2001, WS/CBC Properties sold the lumberyard to a third party for $1,750,000.00, which generated $1,640,000.00 in net proceeds.[14] Buddy received a check for all of the net proceeds on behalf of WS/CBC Properties, which he deposited into a WS/CBC Properties account over which he maintained control.[15] He then divided the net proceeds by drafting three checks from the WS/CBC Properties account: one to himself (the "WS/CBC Proceeds"), one to Scott, and one to Mr. Stevens.[16]

## I.    The path of the WS/CBC Proceeds

Because the First, Fourth, Seventh, and Ninth Causes of Action relate, directly or indirectly, to the WS/CBC Proceeds retained by Buddy from the sale of the WS/CBC Property, tracking those funds is relevant. Buddy distributed $656,257.10 of the total sales proceeds to himself by depositing a check made by him from the WS/CBC Properties bank account into a Raymond James & Associates, Inc. investment account held in Jane's name only (the "RJ Account").[17] Buddy held signatory authority to draw or pay funds from the RJ Account in the form of checking privileges, but he was never designated as an owner of the RJ Account.[18]

---

[11] *Id.* at 00:33:53 – 00:34:34.
[12] Def.'s Ex. 9.
[13] Test. of Scott Hoch, December 12, 2017 Hr'g Audio at 01:45:26 – 01:46:09 and 01:46:25 – 01:46:50.
[14] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 2.
[15] Test. of Buddy Hoch, December 11, 2017 Hr'g Audio at 00:45:00 – 00:45:35.
[16] *Id.* at 00:45:35 – 00:45:50.
[17] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 2.
[18] *Id.* at 3.

5

Scott disagreed with Buddy's division of the proceeds and demanded that Buddy pay further funds to him from the WS/CBC Proceeds, but Buddy refused.[19] Scott retained Keith Kapp, an attorney in Raleigh, North Carolina, to represent him in the dispute with Buddy. Mr. Kapp represented Scott from September 2001 through December 2015.[20] Between 2001 and the initiation of the 2011 Lawsuit, Scott and Buddy, but not Jane, entered into a series of tolling agreements that served to preserve their respective claims against one another arising from the dispute over the WS/CBC Proceeds and several other smaller transactions not relevant here.[21]

In an early attempt to resolve the dispute, on September 25, 2001, Mr. Kapp sent a demand letter to Buddy requesting an accounting of the WS/CBC Property sale proceeds.[22]  In response, a meeting was scheduled and held at Mr. Kapp's law office in Raleigh on September 27, 2001.[23] Scott, Buddy, Mr. Kapp, and Richard Speers, a longtime friend and financial advisor to both Buddy and Scott[24] who long-managed the RJ Account, attended the meeting. Not long after it began, Mr. Kapp left the meeting to work on other matters because it was apparent that Mr. Speers was spearheading the discussion of the controversy between Scott and Buddy.[25] At the end of that meeting, when it was clear that a final resolution would not be reached that day, Mr. Speers drafted a handwritten document reflecting Buddy and Scott's short-term agreement signed by both Scott and Buddy (the "2001 Agreement").[26]

---

[19] *Id.* As discussed above, the State Court ultimately concluded that Buddy overpaid himself by $364,267.00 to Scott's detriment.

[20] *Id.*

[21] Pl.'s Exs. 4 &5.

[22] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 3. The letter was admitted as Def.'s Ex. 3.

[23] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 3.

[24] Mr. Speers has known Buddy for 52 years, Jane for 45 years, and Scott for 52 years. Test. of Richard Speers, December 12, 2017 Hr'g Audio at 03:27:01 – 03:27:15.

[25] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 3.

[26] *Id.* A copy of the 2001 Agreement was admitted as Pl.'s Ex. 1 and as Def.'s Ex. 4.

The first numbered paragraph of the 2001 Agreement reads: "Buddy to give notice to Scott before transferring any money out of Jane's account at Raymond James."[27] Mr. Speers presented credible and uncontroverted testimony that the language reflected the parties' understanding at the September 27, 2001 meeting that the WS/CBC Proceeds had been deposited into Jane's RJ Account.[28] He further testified that the location of the WS/CBC Proceeds in Jane's RJ Account was discussed orally at the September 27, 2001 meeting.[29] Mr. Speers further recalled the deposit of the WS/CBC Proceeds into the RJ Account in 2001, and testified that it was the only deposit into the RJ Account ranging in the "six figures" during the time he managed the account.[30]

The funds remained in the RJ Account until 2009 when Mr. Speers changed his firm's affiliation from Raymond James to TD Ameritrade. The RJ Account followed him to TD Ameritrade and a new brokerage account (the "TDA Account") was opened in Jane's sole name, again with Buddy holding only signatory rights over it.[31] Buddy's signatory authority was not changed until August 14, 2013, when by letter Jane instructed TD Ameritrade to remove Buddy as an account signatory.[32] On September 24, 2013, Jane created the Jane Trust,[33] and the following

---

[27] Pl.'s Ex. 1; Def.'s Ex. 4.

[28] Test. of Richard Speers, December 12, 2017 Hr'g Audio at 03:55:45 – 03:56:10.

[29] *Id.* at 03:54:20 – 03:56:32. Mr. Speers read portions of his prior affidavit into the record, which he reaffirmed were true and accurate, stating: "During the discussion it was said that the money from this disbursement has been placed in Jane's Raymond James account." *Id.* at 03:54:20 – 03:54:30. He further read from his affidavit that "[a] concern of Scott's at the September 27, 2001 meeting was where the funds distributed to Buddy were located. Because it was mentioned that the funds were in Jane's Raymond James account, that's what's listed in the handwritten agreement." *Id.* at 03:55:53 – 03:56:10. The affidavit clarified his memory and enabled him to further testify:

> Q: Ok. So, after reviewing your affidavit, do you believe that during the September 27, 2001 meeting that Scott and Buddy were present at that it was stated that the money at issue was in Jane's Raymond James account?
>
> Mr. Speers: Yes.

*Id.* at 03:56:12 – 03:56:32.

[30] *Id.* at 03:30:34 – 03:31:42.

[31] *Id.* at 03:32:00 – 03:32:17.

[32] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 5. The letter was admitted as Pl.'s Ex. 56.

[33] The Jane Trust Agreement was admitted as Def.'s Ex. 17.

day (September 25, 2013) Jane transferred the entire TDA Account contents to the Jane Trust for no consideration.[34]

On February 1, 2016, the balance of the TDA Account (then held in the name of the Jane Trust rather than Jane individually) was $722,119.91.[35] On February 25, 2016, Jane transferred $713,719 from the TDA Account into her individual checking account at Wells Fargo Bank (the "Jane Checking Account").[36] Four days later, on February 29, 2016, she moved $700,000.00 from the Jane Checking Account into a savings account at Wells Fargo owned by the Jane Trust (the "Jane Trust Savings Account").[37]

On March 24, 2016, the State Court entered an order freezing $475,000 held in the Jane Trust Savings Account to preserve those funds in the event Scott proved successful in the present case.[38] On July 5, 2016, the State Court entered a separate order freezing an additional $125,000 located in the Jane Trust Savings Account, effectively prohibiting any transfer from that account that would take its balance below $600,000.[39] Shortly after the Petition Date, on July 21, 2016, the Jane Trust Savings Account had a balance of $600,626.44.[40] By consent order entered in the bankruptcy case on August 22, 2016, counsel for Jane and for Scott agreed to transfer the balance of the Jane Trust Savings Account to the trust account of Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. (the "Brooks Pierce Trust Account"), the law firm now representing Scott in

---

[34] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 5. A letter dated September 25, 2013 signed by Jane authorizing TD Ameritrade to transfer all assets from the TDA Account to another TD Ameritrade account in the name of the Jane Trust was admitted as Def.'s Ex. 26.

[35] Pl.'s Ex. 64 at 6. Monthly Statements for the TDA Account for the years 2013, 2014, 2015, and 2016 were admitted as Plaintiff's Exhibits 61, 62, 63, and 64, respectively.

[36] Bearing an account number ending in 7753; Pl.'s Ex. 64 at 8; Pl.'s Ex. 43 at 5.

[37] Bearing an account number ending in 8202; Pl.'s Ex. 43 at 5; Pl.'s Ex. 45 at 2.

[38] Prelim. Inj. filed March 24, 2016 in the 2014 Lawsuit, Pl.'s Ex. 12 at 9–10.

[39] TRO filed July 14, 2016 in the 2014 Lawsuit, Pl.'s Ex. 13 at 8.

[40] Jane's Schedule A/B, BR D.E. 27 at 11.

this matter, pending final disposition of this controversy. Those funds remain in the Brooks Pierce Trust Account pending further order from the court.[41]

## II.    The TOP Properties

The remaining cause of action (the Second) centers on a second asset from which Scott seeks to recover the 2011 Judgment: two townhomes he alleges were fraudulently transferred from Buddy to the Jane Trust.[42] As with the WS/CBC Proceeds, tracing the path of the TOP Properties is helpful in orienting the dispute.

As part of the 2011 Lawsuit, Buddy asserted a counterclaim against Scott, contending that Buddy was entitled to ownership of two townhomes held jointly.[43] The State Court agreed and ordered Scott to convey two townhomes to Buddy, the first with an address of 3613 Top of the Pines Court, Raleigh, North Carolina, 27604 ("3613 TOP") and the second a neighboring unit bearing an address of 3615 Top of the Pines Court, Raleigh, North Carolina, 27604 ("3615 TOP") (together, the "TOP Properties").[44] Scott conveyed the TOP Properties to Buddy on October 17, 2013.[45] As a result, when the TOP Properties were conveyed to Buddy, they were held solely in his name and free of any liens or encumbrances.[46]

Prior to his acquisition of the TOP Properties, and as was the case for at least the prior twenty years, Buddy held clear legal title to no appreciable assets upon which a judgment lien could attach and thereby become subject to judgment execution and levy. To restore his preferred

---

[41] Consent O on Mot. to Permit Trust Account of the Marilynn Jane Hoch Revocable Trust to be Transferred, BR D.E. 47 at 3.

[42] *See* Compl., AP D.E. 10 at 87–88.

[43] Answer & Countercl. filed October 18, 2011 in the 2011 Lawsuit, Pl.'s Ex. 6 at 21–23.

[44] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 5–6. *See also* J. filed September 11, 2013 in the 2011 Lawsuit, Pl.'s Ex. 8.

[45] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 6. *See also* N.C. Special Warranty Deed, Pl.'s Ex. 15.

[46] Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:33:22 – 02:33:50.

"judgement-proof" status with little delay, Buddy quickly arranged to convey both TOP Properties to the Jane Trust at an ostensible purchase price of $100,000 each.[47] Less than two weeks after the TOP Properties were deeded to Buddy, Jane applied to Branch Banking & Trust ("BB&T") for financing to purchase the TOP Properties.[48] She received loan approvals and drew $80,000 from BB&T on each transaction (a total of $160,000),[49] with the remaining proceeds drawn on a line of credit on Jane and Buddy's marital home located at 1816 Pictou Road, Raleigh, North Carolina.[50]

3615 TOP was deeded to the Jane Trust on December 23, 2013, at a sales price of $100,000.[51] Buddy received the $98,619.64 net proceeds.[52] However, rather than retaining that money, Buddy deposited the funds into the Jane Checking Account on December 26, 2013.[53] The "sale" of 3613 TOP to the Jane Trust closed January 7, 2014, also at a sales price of $100,000.[54] Buddy received the net sale proceeds of $99,800.00,[55] which he exchanged for several cashier's checks. He gave those checks to Jane and she deposited them into the Jane Checking Account.[56]

---

[47] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 6.

[48] Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:33:55 – 02:34:13; Pl.'s Exs. 35, 43 & 46.

[49] Pl.'s Exs. 35 & 43. The marital home was held as tenancy by the entireties and thus at that time was not subject to the claims of creditors holding claims only against Buddy.

[50] Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:39:30 – 02:39:45.

[51]  Stipulated Facts, Final Pretrial O, AP D.E. 100 at 6. *See also* Def.'s Exs. 28-30.

[52] Def.'s Ex. 30; Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:41:07 – 02:41:37.

[53] Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:41:07 – 02:41:45; Pl.'s. Ex. 40 at 25. Jane acknowledged that the deposit of $98,619.64 into the Jane Checking Account was "the exact same amount of the funds Buddy received from the closing on the 3615 property."

[54] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 6. *See also* Def.'s Exs. 39-43.

[55] Def.'s Ex. 42. Test. of Buddy Hoch, December 11, 2017 Hr'g Audio at 01:34:42 – 01:34:58.

[56] Unlike the closing proceeds for 3615 TOP, which were clearly deposited in the Jane Checking Account on December 26, 2013 (notwithstanding Buddy's testimony to the contrary that he turned it into several smaller certified checks), *see* Pl.'s Ex. 40 at 25, no showing was made that the 3613 TOP closing proceeds were deposited directly into the Jane Checking Account. However, three deposits of $40,000.00, $32,085.05, and $21,450.44 (a total of $93,535.49) were made into the account on February 20, 2014. Pl.'s Ex. 41 at 6. Buddy's testimony supports the conclusion that the entire $99,800.00 in closing proceeds from 3613 TOP was returned to Jane in short order:

Q: You did the same thing with that 99,800 dollars that you did with the proceeds that you got from the sale of 3615, right?

Buddy: Yes sir.

Q: You went to the same bank, got several certified checks, right?

Buddy: Yes sir.

Q: That you used to make a very big payment on the home equity line in March of 2014, right?

Shortly after the transfers of the TOP Properties from Buddy to the Jane Trust, each townhouse was sold to a bona fide third-party purchaser.[57]

### III.    Past pattern of evasion

With his pre-judgment transfer of the TOP Properties to the Jane Trust, Buddy continued his decades-long practice of holding no appreciable assets in his name in order to maintain "judgment proof" status in any pending or future litigation in which he, but not Jane, was a defendant. Buddy and Jane began structuring their finances in this manner when in the late 1980's a couple named Wages purchased a house with a leaky roof built by Buddy.[58] They sued Buddy and obtained a judgment against him for $6,300 in 1987 or 1988.[59] The judgment was not paid until 2007.[60] During the intervening twenty years, Buddy put most of his liquid assets into accounts bearing Jane's name only.[61] Throughout this period and since (a total of more than thirty years), Buddy has not held a monetary account (checking, savings, or investment) in his name, whether singularly or jointly. Effectively, all of Buddy and Jane's marital non-real estate assets have been held in accounts bearing Jane's name only during the last three decades.[62]

At trial, Buddy denied that the purpose of the arrangement was to evade paying creditors like the Wages.[63] When confronted with Jane's deposition testimony that confirmed the arrangement was made with the intent to evade creditors, Buddy claimed that, while not

---

Buddy: I'm not sure when it was. I . . . uh, there again, ***gave them to Jane, she put them in her checking account***.
Test. of Buddy Hoch, December 11, 2017 Hr'g Audio at 01:35:10 – 01:35:40 (emphasis added).

[57] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 6.

[58] Test. of Buddy Hoch, December 11, 2017 Hr'g Audio at 00:24:20 – 00:24:36.

[59] *Id.* at 00:24:45 – 00:25:15. Buddy "didn't remember the exact amount" of the judgment, but conceded that $6,300 "sounds about right."

[60] *Id.* at 00:25:51 – 00:25:57.

[61] *Id.* at 00:25:58 – 00:26:15.

[62] *Id.* at 00:26:15 – 00:26:25.

[63] *Id.* at 00:26:25 – 00:26:57.

questioning his wife's honesty, he would "question, maybe, her knowledge about stuff, because she didn't have a lot to do with my business."[64] Jane meanwhile testified that she was in charge of finances in the household since at least the 1980s, and that it was a joint decision to put all of their financial assets in her name only.[65]  She admitted that one reason for this arrangement was to shield assets from Buddy's judgment creditors, and that Buddy was privy to the scheme.[66]

## DISCUSSION

**Summary of Legal Conclusions**

The First, Second, and Ninth Causes of Action all assert entitlement to relief arising from the North Carolina Uniform Voidable Transactions Act (the "UVTA"), N.C. Gen. Stat. §§ 39-23.1 to 39-23.12. However, the First Cause of Action is barred by the UVTA's statute of repose. N.C. Gen. Stat. § 39-23.9(1). Scott is not entitled to relief on the Ninth Cause of Action because revocation of signatory authority on a deposit account is not a "transfer" as defined under the UVTA.[67] With respect to the Fourth Cause of Action (fraud as to Buddy), Scott is not entitled to relief because he did not reasonably rely on any fraudulent misrepresentation made by Buddy, and even if he did, no damages resulted from such reliance. Further, Scott is not entitled to relief under the Seventh Cause of Action (breach of contract by Buddy) because he failed to prove any legally cognizable damages resulting from such breach, as Buddy's duty under the 2001 Agreement to

---

[64] *Id.* at 00:27:55 – 00:28:03.
[65] Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 01:54:02 – 01:54:25.
[66] Jane made this admission when confronted with prior deposition testimony:
Q: Do you remember saying in your deposition that you did it to protect assets from Buddy's creditors?
Jane: I do remember saying that. I'm just saying that it that may not be the whole reason.
Q: And you discussed that decision with Buddy, correct?
Jane: Yes.
Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 01:54:25 – 01:54:53.
[67] If treated as a "transfer" that could be avoided pursuant to § 39-23.7(a)(1), Buddy would only be renamed a signatory on the TDA Account. However, signatory authority alone has no value to third parties, as it is not subject to execution levy and thereby remains beyond Scott's reach as an executing judgment creditor.

12

notify Scott before moving money from Jane's RJ Account was breached, if at all, in 2009 when Jane (not Buddy) moved the account to TD Ameritrade. Even if Buddy had performed under the 2001 Agreement and notified Scott prior to this transfer, Scott would hold no remedy against Jane because the statute of repose under the UVTA as to Jane (who was not a party to the tolling agreements) began running in 2001, and had long since expired by 2009.

Nevertheless, with respect to the Second Cause of Action, Scott is entitled to relief because Buddy transferred the TOP Properties to Jane and the Jane Trust, and she received the transfers, with the intent to hinder, delay, or defraud Scott. The court will address the successful claim first.

## I.    Second Cause of Action – Fraudulent Transfer of the TOP Properties

Scott asserts that the transfer of the TOP Properties from Buddy to the Jane Trust are avoidable under N.C. Gen. Stat. § 39-23.4(a)(1),[68] which provides that a transfer made by a debtor is voidable as to a transferee if the transfer was made "with intent to hinder, delay, or defraud any creditor of the debtor." N.C. Gen. Stat. § 39-23.4(a)(1).  To obtain relief under § 39-23.4(a)(1), Scott must prove that: (1) he is now or was a creditor of Buddy's at the time of the transfer; (2) the sale of the TOP Properties from Buddy to the Jane Trust constituted a transfer under the UVTA; and (3) Buddy made the transfer with actual intent to hinder, defraud, or delay his creditors. As the proponent of the claim, Scott bears the burden of proving these elements by a preponderance of the evidence. N.C. Gen. Stat. § 39-23.4(c).

### A.  Scott is a creditor under the UVTA

A creditor is broadly defined as "a person that has a claim," N.C. Gen. Stat. § 39-23.1(4), and a claim encompasses "a right to payment, whether or not the right is reduced to judgment,

---

[68] Compl., AP D.E. 10 at 87–88.

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." N.C. Gen. Stat. § 39-23.1(3). A debtor is "a person that is liable on a claim." N.C. Gen. Stat. § 39-23.1(6).

Here, it is undisputed that Scott held a claim against Buddy at the time the TOP Properties were transferred to the Jane Trust: he had filed the 2011 Lawsuit against Buddy some two years prior.[69] The case was pending prior to the transfer of the TOP Properties to the Jane Trust, as the transfers took place less than two months before the trial of the 2011 Lawsuit. Even though Scott's claims against Buddy in the 2011 Lawsuit had not been "reduced to judgment," he nevertheless was a creditor of Buddy as defined by the statute when the transfers of the TOP Properties to the Jane Trust occurred. Accordingly, Buddy is a debtor under the UVTA.

### B. The sale of the TOP Properties to the Jane Trust was a transfer under the UVTA

A transfer is defined as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset . . . ." N.C. Gen. Stat. § 39-23.1(12); an asset is defined as "[p]roperty of a debtor," N.C. Gen. Stat. § 39-23.1(2), with certain enumerated exclusions not presently relevant. Property is defined in the broadest possible sense as "[a]nything that may be the subject of ownership." N.C. Gen. Stat. § 39-23.1(10).

It is undisputed that Buddy owned the TOP Properties and that he transferred both to the Jane Trust on December 23, 2013 and January 7, 2014.[70] Thus, the sale of the TOP Properties from Buddy to the Jane Trust constituted a transfer under the UVTA.

---

[69] *See* Stipulated Facts, Final Pretrial O, AP D.E. 100 at 3.
[70] *See id.* at 5–6.

### C. Buddy transferred the TOP Properties to the Jane Trust with the actual intent to hinder, defraud, or delay his creditors

Once a transfer is established, Scott must show that the transfers of the TOP Properties were made with the actual intent to defraud. Actual intent is inherently difficult to determine based on pleadings and affidavits.  However, "[b]ecause a debtor is not likely to testify that he had the requisite intent to defraud creditors, the intent to hinder, delay, or defraud can be inferred from extrinsic evidence and the presence of badges of fraud." *In re Clarkson*, 387 B.R. 882, 887 (Bankr. S.D. Fla. 2008). The UVTA "provides a non-exhaustive list of badges of fraud to be considered in determining intent under subsection (a)(1)." *Id.* at 889 (citing N.C. Gen. Stat. § 39-23.4(b)).[71] "When analyzing these factors to make a determination of the debtor's intent, a court should evaluate the entirety of the circumstances surrounding the transaction at issue and 'may appropriately take into account all indicia [negating] as well as those suggesting fraud.'" *In re Schofield-Johnson, LLC*, 462 B.R. 539, 543 (Bankr. M.D.N.C. 2011) (quoting N.C. Gen. Stat.

---

[71] The thirteen most common factors that a court should consider to determine whether a transfer was made with the actual intent to hinder, defraud, or delay creditors are listed in the statute:

(1)   The transfer or obligation was to an insider;
(2)   The debtor retained possession or control of the property transferred after the transfer;
(3)   The transfer or obligation was disclosed or concealed;
(4)    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5)   The transfer was of substantially all the debtor's assets;
(6)   The debtor absconded;
(7)   The debtor removed or concealed assets;
(8)   The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9)   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10)   The transfer occurred shortly before or shortly after a substantial debt was incurred;
(11)   The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor;
(12)   The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and
(13)   The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. Gen. Stat. § 39-23.4(b).

15

§ 39-23.4(b) cmt. 6).  Badges of fraud may be considered by the court in evaluating the debtor's
intent: "[A] determination concerning fraudulent intent depends largely upon an assessment of the
credibility and demeanor of the debtor." *Mercantile Peninsula Bank v. French (In re French)*, 499
F.3d 345, 353 (4th Cir. 2007) (quoting *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252
(10th Cir. 1987)).

     **i.**    **Badges of Fraud**

Here, and as the court discussed in its opinion on the cross-motions for summary judgment,
several factors indicating and negating fraudulent intent exist.[72] Jane previously argued that Buddy
lacked fraudulent intent because the transfers were made for reasonably equivalent value and
because they were not concealed since the sales were recorded on the public record at the Wake
County Register of Deeds Office. However, at trial, the testimony of both Buddy and Jane,
including their demeanor and chronic inconsistencies, contradicted their attempts to invoke the
third and eighth factors as evidence that the two transfers were not fraudulent in nature.

While the HUD-1 statements, if considered alone, would appear to reflect to an outsider
that the TOP Properties were purchased for a reasonably equivalent value of $100,000 each, those
transactions were in actuality mere strawman deals. Jane and Buddy both testified that it was their
longstanding practice to keep all of their assets in Jane's name, starting at least with their attempts
to hide assets from the Wages in 1987.  Further, the net sale proceeds paid by Jane to Buddy (paid
from funds Jane transferred to the Jane Trust a few weeks before) were promptly returned to Jane
by Buddy. Thus, neither the net sale proceeds nor the TOP Properties remained as assets held in
Buddy's name, but rather became property under the sole ownership and control of Jane, whether

---

[72] *See* O Allowing in Part and Den. in Part Cross-Mots. for Summ. J., AP D.E. 89 at 27–28.

individually or through the revocable trust that she alone controlled.  The fact that the sale of the TOP Properties was effectively for no consideration, but elaborately structured to appear as though reasonable value was being paid, speaks to the depth of Jane and Buddy's joint efforts to evade Buddy's creditors. All of Buddy's assets were intentionally "laundered" beyond Scott's reach. Accordingly, the third factor weighs heavily *against* Buddy and Jane as the transfers were not for a reasonably equivalent value received and retained by Buddy.

Numerous other badges of fraud support the court's finding that Buddy transferred the TOP Properties to Jane with intent to hinder, delay, or defraud Scott. While the transfer was nominally to the Jane Trust, it is undisputed that Jane has sole control over the Jane Trust, and thus the transfer was effectively to Jane herself, an insider. To the extent Buddy and Jane jointly control property in Jane's name, as has long been their practice, Buddy retained a measure of control of the property after the transfer.[73] Buddy had been sued when the transfer of the TOP Properties was made; in fact, the transfer *to* Buddy from Scott[74] was a product of Buddy's counterclaim in the 2011 Lawsuit, and the transfers *by* Buddy to the Jane Trust were made less than sixty (60) days prior to the jury trial of Scott's claims against Buddy in the same lawsuit. The TOP Properties represented all or substantially all of Buddy's assets, and following the transfers, he again possessed no significant assets in his own name, making him individually insolvent following the transfers.

---

[73] In fact, Jane testified that the purpose of transferring the TOP Properties to the Jane Trust was to administer the rental income from them. But Buddy, not Jane, is the one with decades of experience building and developing real estate and managing rental properties, and it is more likely than not that, prior to the resale of the TOP Properties, Buddy, not Jane, was the person directing who rented the units and at what rate.

[74] More accurately, the transfer was from T.O., LLC, an entity Scott controlled. Stipulated Facts, Final Pretrial O, AP D.E. 100 at 5–6.

17

### ii.    Buddy and Jane's testimony

Equally important, the court finds both Buddy and Jane's testimony regarding the transfer of the TOP Properties to be largely inconsistent and incredible with respect to their goals and intent. Jane's testimony, when viewed in light of the record and compared with the more credible testimony of Mr. Speers, paints a picture of a marriage wherein Jane is paradoxically extremely independent and proactive in making financial decisions regarding the couple's finances, while completely in the dark about key developments affecting the household finances she purportedly manages on her own. In short, it appears that Jane and Buddy were in fact intimately involved in making financial decisions together until it became a potential liability for both of them, at which point each was fairly tripping over the other in a race to demonstrate how compartmentalized and separate their marriage was with respect to their finances.

Jane testified that she manages the household finances and "discuss[es] finances with [her] husband."[75] Yet when questioned, Jane claimed to be unaware of the dispute between Buddy and Scott concerning ownership of the WS/CBC Proceeds.  She claim to have no idea that Buddy and Scott signed thirty (30) tolling agreements regarding the dispute over a span of ten (10) years,[76] even though the disputed check for $656,257.10 was deposited into her brokerage account and remained there for more than a decade. If Jane was "in charge" of the family finances, reviewed the account "regularly,"[77] and discussed family finances with Buddy, it seems incredible that she was unaware of the dispute over the WS/CBC Proceeds in her RJ Account during the interim ten years when Buddy and Scott were tolling their disagreement. However, whether Jane knew of Scott's claim to the WS/CBC Proceeds during that period is irrelevant; it is undisputed that she

---

[75] Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 01:56:13 – 01:56:26.
[76] Test. of Jane Hoch, December 13, 2017 Hr'g Audio at 00:18:20 – 00:18:47.
[77] *Id.* at 01:31:40 – 01:31:51.

18

was aware of Scott's claim when he filed the 2011 Lawsuit, and remained aware of the disputed nature of the funds in 2013 when she purported to buy the TOP Properties from Buddy.

Jane further related that, even though they apparently discuss finances together, she never consulted Buddy before removing his ability to write checks from her TDA Account.[78] Her memory of this event appears to have sharpened over the years, because she testified at trial that she was "certain" that she had not discussed the signatory removal with Buddy before taking that action. However, when confronted with a prior deposition in which she testified that she could not remember whether she discussed it with Buddy before the fact, Jane admitted that "at that point in time I could not recall."[79] In addition, her name was on multiple entities that Buddy controlled, and he previously testified that in "any partnership transaction with Scott, any time the interest was shown as [Jane's], it was [his]."[80] This deception purportedly went so far as listing Jane as a partner on tax returns when the interest was in fact owned by Buddy.[81]

Attempting to distance herself from Buddy and legitimize the transactions at issue, Jane claimed that Buddy had no authority to make investment decisions regarding the RJ Account or her TDA Account, that she made those decisions with the help and advice of Mr. Speers, and that Mr. Speers kept her informed of the account status.[82] However, Mr. Speers testified that it was generally *Buddy* with whom he discussed the investment decisions and direction of the account.[83]

---

[78] Testimony of Jane Hoch, December 11, 2017 Hr'g Audio at 02:23:55 – 02:24:16.
[79] *Id.* at 02:24:05 – 02:24:15.
[80] Testimony of Buddy Hoch, December 11, 2017 Hr'g Audio at 01:24:16 – 01:24:35.
[81] *Id.* at 01:24:35 – 01:25:04. *See also* Pl.'s Ex. 36 at 24–25.
[82] Test. of Jane Hoch, December 13, 2017 Hr'g Audio at 00:13:55 – 00:14:51.
[83] Q: In terms of discussing the investment strategy for that account, who did you discuss that with?
Mr. Speers: Generally Buddy.
Test. of Richard Speers, December 12, 2017 Hr'g Audio at 03:32:32 – 03:32:44.

Buddy testified that he, Jane, and Mr. Speers habitually met on Thursdays for lunch,[84] suggesting a much more collaborative relationship between the three than Jane attempted to portray.

Apparently in a further effort to divide on paper what in reality was a collusively commingled mass of their household finances, Jane and Buddy began filing separate tax returns *after* Scott sued *both* Buddy and Jane and it appeared that their carefully-structured single name finances might finally be made accountable to Scott's 2011 Judgment. Mr. Speers, who prepared tax returns for Jane and Buddy, testified that between 1999 and 2013 he prepared joint tax returns for Jane and Buddy, but that beginning in 2014, Jane and Buddy instructed him to prepare separate tax returns for them based "on advice of their attorney."[85] Certainly, such a transition was not for their immediate pecuniary benefit, as Mr. Speers testified that based on his analysis, filing their taxes separately in 2014 resulted in higher taxes, rather than saving them money.[86]

In summary, Jane and Buddy have a long and clear history of using Jane's name to conceal Buddy's money, property interests, and other assets. The court finds that both Buddy and Jane jointly planned and executed the transfer of the TOP Properties with the specific intent to hinder Scott's collection efforts related to the 2011 Judgment, that the Jane Trust was a mechanism used in effectuating this transfer, and that this transfer was part of a broader scheme to structure their assets to deliberately evade Scott's collection attempts.

### D.  The Jane Trust's affirmative defense

Having concluded that Scott has met his burden of proving a *prima facie* case of a voidable transaction under § 39-23.4(a)(1) of the UVTA, the court now turns to the Jane Trust's affirmative defense as transferee. The UVTA provides that a transfer is not voidable under § 39-23.4(a)(1)

---

[84] Test. of Buddy Hoch, December 11, 2017 Hr'g Audio at 00:31:16 – 00:31:28.
[85] Test. of Richard Speers, December 12, 2017 Hr'g Audio at 03:28:12 – 03:28:53.
[86] *Id.* at 03:28:55 – 03:29:30.

against "a person that took in good faith and for a reasonably equivalent value . . . ." N.C. Gen. Stat. § 39-23.8. As transferee, the Jane Trust[87] "has the burden of establishing good faith and the reasonable equivalence of the consideration exchanged." *Estate of Hurst ex rel Cherry v. Jones*, 230 N.C. App. 162, 176, 750 S.E.2d 14, 24 (2013) (quoting N.C. Gen. Stat. § 39-23.8(a) cmt. 1).

Because the Jane Trust was a self-settled revocable *inter vivos* trust, Jane is the sole settlor and the trustee, and maintains sole control of the Jane Trust during her lifetime. She received and used the money at her unbridled will. Jane has failed to maintain the separate identity of the Jane Trust to third parties, and has treated the assets of the Jane Trust as her individual assets. For example, both of the Uniform Residential Loan Applications completed by Jane reflect that she applied for credit individually, listed the TDA Account owned by the Jane Trust as a personal liquid asset, listed the Pictou Road Property previously conveyed to the Jane Trust as her personal real estate asset, and indicated that she was buying both of the TOP Properties as an individual and that title would be held by her individually. Nowhere in either application did Jane mention the Jane Trust, even though the vast majority of the assets listed on each were owned by it.[88] In addition, on the loan application for 3613 TOP, Jane listed 3615 TOP as a real estate asset she owned, but it had never been titled in her name.[89] Thus, whether the Jane Trust acted in good faith from the perspective of the settlor or the trustee is irrelevant; in either case, it is Jane's conduct and lack of restraint that is relevant in ascertaining whether the Jane Trust took the TOP Properties in good faith and for reasonably equivalent value.

---

[87] The Jane Trust is entitled to assert defenses as a transferee because the UVTA defines "person" broadly and expressly includes trusts within this definition. N.C. Gen. Stat. § 39-23.1(9).

[88] Def.'s Exs. 35 & 43.

[89] Def.'s Ex. 43 at 3.

i.    **Good Faith**

When asked whether she and Buddy came up with the idea together to transfer the TOP Properties from Buddy to the Trust, Jane gave a non-credible response: she claimed that the purpose of purchasing the TOP Properties through the Jane Trust was "because [she] needed to have a way of using the properties to help offset some of the legal fees that were occurring with the lawsuit."[90] Jane's response is particularly puzzling as she was not a party to that suit and did not present evidence to show that she had guaranteed Buddy's legal fees associated with the 2011 Lawsuit. In fact, she later admitted that the legal fees related to the 2011 Lawsuit were solely Buddy's responsibility.[91] Jane also acknowledged that the sale of 3615 TOP occurred thirty five (35) days before the jury trial began in the 2011 Lawsuit.[92] Buddy, as the seller of 3615 TOP, received $98,619.64[93] at closing, which he deposited into the Jane Checking Account three days later, on December 26, 2013.[94] Thus, the net effect of the sale of 3615 TOP was, in the space of less than two (2) months, to convert Buddy's wholly-owned, unencumbered asset worth $100,000 into $98,619.64 in cash in Jane's name only, and beyond Scott's reach as a soon-to-be-judgment creditor of Buddy.

The fact that this transaction occurred in such a short period of time[95] and on the eve of a jury trial in which Buddy faced probable liability for several hundred thousand dollars is indicative

---

[90] Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:36:40 – 02:36:58.

[91] *Id.* at 02:37:26 – 02:37:51.

[92] *Id.* at 02:38:10 – 02:38:30.

[93] Jane testified that Buddy's subsequent deposit of $98,619.64 into the Jane Checking Account was "the exact same amount of the funds Buddy received from the closing on the 3615 property." Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:41:07 – 02:41:37.

[94] *Id.* at 02:41:07 – 02:41:45; Pl.'s. Ex. 40 at 25.

[95] In fact, when questioned about the three-day gap between the December 23, 2013 closing and the December 26, 2013 deposit into the Jane Checking Account, Jane flippantly remarked that "banks are closed on Christmas," suggesting that the transfer would have occurred even more expeditiously but-for this inconvenient closure. Test. of Jane Hoch, December 11, 2017 Hr'g Audio at 02:41:15 – 02:41:49.

of Buddy and Jane's intent. On October 17, 2013, Buddy Hoch was the sole record owner of two townhomes worth approximately $200,000.00. By January 4, 2014, his ephemeral solvent status had dissipated by acting in concert with Jane to transfer vulnerable assets, in this instance suspiciously close to the start of the 2011 Lawsuit trial that began on January 27, 2014.[96] It is also worth noting that in December 2013, when Jane per her testimony purportedly needed money to help pay Buddy's legal fees in the 2011 Lawsuit, the TDA Account then held in the name of the Jane Trust had a balance of $1,316,860.38.[97] If Jane intended to pay Buddy's legal fees using money that she wholly controlled, why did she incur the additional expenses of obtaining two bank loans and incurring two sets of closing costs associated with selling the TOP Properties to the Jane Trust rather than simply writing a check to pay the legal fees?

Because of the timing and structure of the sale of the TOP Properties, the court finds that neither Jane nor the Jane Trust acted in good faith when purporting to "purchase" the TOP Properties from Buddy. Both Jane and the Jane Trust at all times acted knowingly and with intent or scienter reasonably calculated to deceive, hinder, or delay Scott as a bona fide creditor of Buddy.

### ii.    Reasonably Equivalent Value

While the Jane Trust's affirmative defense fails for its want of good faith, it is worth examining briefly why the good faith transferee defense also fails for lack of reasonably equivalent value for the TOP Properties.

The good faith transferee defense is intended to protect transferees from being deprived of both the asset they acquired from the fraudulent transferor *and* the value they gave in exchange. Here, the Jane Trust is not deprived of any asset it parted with in exchange for the TOP Properties,

---

[96] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 6. No showing of any other substantial debts existing as of this time was made by Buddy either.

[97] Pl.'s Ex. 61 at 90.

because it did not put up the money for the purchase — Jane did, and that money was transferred back to her by Buddy within days of each "sale." Specifically, the lion's share (80%) of the "purchase price" paid for the TOP Properties was advanced by BB&T based on loans it made to Jane Hoch *personally* rather than the Jane Trust. Second, as noted above, the Jane Trust has no practical existence separate from Jane as she alone controlled it and could revoke the trust at any time, or even simply drain it of all assets. Jane routinely failed to treat the Jane Trust as a separate legal entity, and exclusively used its assets to pay her personal expenses. Finally, the fact that the purchase price was transferred back to Jane within a few days of each sale belies the sincerity of any argument claiming that the Jane Trust paid reasonably equivalent value.

Accordingly, the Jane Trust does not qualify as a good faith transferee for value and cannot avail itself of any protections afforded under N.C. Gen. Stat. § 39-23.8(a).

### E.  Scott's Remedy under the UVTA

Because it is undisputed that both TOP Properties have since been sold by the Jane Trust to true bona fide third-party purchasers, voiding the transfer of the TOP Properties from Buddy to the Jane Trust is neither practical nor permitted under § 39-23.8(b)(1). However, Scott is entitled to three alternative remedies under the UVTA.

### i.        Scott's remedy against Buddy

First, because Scott has already obtained a judgment against Buddy resulting from the 2011 Lawsuit, the court could permit Scott to levy execution on "the asset transferred or its proceeds." N.C. Gen. Stat. § 39-23.7(b). Because the asset transferred has passed beyond the reach of Scott, he would instead be entitled to levy execution against the proceeds of the sale of the TOP Properties. The issue here is that while Scott presented evidence that traced the WS/CBC Proceeds through intermediate transfers and ultimately into the Brooks Pierce Account, no such tracing

24

evidence was offered at trial for the proceeds from the sale of the TOP Properties. The evidence shows that the closing proceeds from 3615 TOP were deposited into the Jane Checking Account on December 26, 2013,[98] but no conclusive testimony was given showing where the money went next. Moreover, the commonly-employed tool in such situations, the lowest intermediate balance rule, is unavailing to Scott because the Jane Checking Account had a balance of only $8,113.56 by January 9, 2014.[99]

### ii.    Scott's remedy against the Jane Trust

However, Scott is entitled to the alternative remedy of a judgment against the Jane Trust, as the first transferee "for the value of the asset transferred," N.C. Gen. Stat. § 39-23.8(b)(1), with the amount of the judgment subject to "adjustment as the equities may require." N.C. Gen. Stat. § 39-23.8(c). The North Carolina Court of Appeals had occasion to examine this provision and declined to adjust a judgment "as the equities may require" where the asset transferred was cash. *Estate of Hurst ex rel. Cherry v. Jones*, 230 N.C. App. 162, 178, 750 S.E.2d 14, 25 (2013). Rather, it observed, the equitable adjustment provisions of § 39-23.8(c) were more appropriately reserved for situations where the value of a tangible transferred asset is at issue, such as

> where the transferee made improvements to the property that enhances its value, or the property was subjected to liens that reduced its value. N.C. Gen. Stat. § 39–23.8, Official Cmt. 3. This is confirmed by the North Carolina Comment to subsection (c) which states that it "is significant if the value of an asset has changed while in the hands of a transferee." N.C. Gen. Stat. § 39–23.8, N.C. Cmt.

*Id.*

This situation, unlike the cash transfer in *Cherry*, requires an invocation of the equitable adjustment provisions of the UVTA because the TOP Properties were not sold by Buddy to the

---

[98] Pl.'s Ex. 40 at 25.

[99] *See, e.g.*, *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723–24 (4th Cir. 1998) (explaining the operation of the lowest intermediate balance rule when seeking to recover a judgment from commingled funds).

Jane Trust with Buddy receiving *and retaining* reasonably equivalent value. Instead, the subsequent resale of both properties to third parties in arms-length transactions represent the best indications of the "value" of the TOP Properties. Where two parties collude to transfer an asset subject to the valid claims of a creditor for the purpose of putting an asset or its value beyond the reach of the creditor, it is inequitable to allow a transaction price born of collusion to determine the ultimate value of the claim against the transferee. Fortunately, the court is not left to rely solely on the sale price of $100,000 determined by Buddy and Jane for each of the TOP Properties, as they were both subsequently resold to an arms-length buyer under actual market conditions.

3613 TOP was resold by the Jane Trust to a third-party purchaser on April 15, 2016 for $107,750.[100] This sale price is virtually equal to 3613 TOP's June 1, 2011 appraised value of $107,000.[101] Similarly, 3615 TOP was resold by the Jane Trust to a third-party purchaser on April 27, 2016 for $109,000.00.[102] Further, on her loan application to BB&T for 3613 TOP, Jane listed the value of 3615 TOP as $115,537.00.[103] These valuations, together with the market sale prices, lead the court to conclude that the value of 3613 TOP was $107,750.00 when it was transferred from Buddy to the Jane Trust, and that the value of 3615 TOP was $109,000.00 when it was transferred. Scott is thus entitled to a money judgment against the Jane Trust for the combined value of the assets transferred in the amount of $216,500.

### iii.    Scott's remedy against Jane individually

In the alternative, Scott is entitled to a judgment against Jane individually as a result of the transfer of the TOP Properties, for two reasons. First, because Jane failed to treat the Jane Trust as

---

[100] Def.'s Ex. 47.
[101] Def.'s Ex. 44.
[102] Def.'s Ex. 48.
[103] Def.'s Ex. 43 at 3.

a separate entity and used it as a mere instrumentality to effectuate the transfer of the TOP Properties, she is liable to Scott to the same extent as the Jane Trust, jointly and severally, under § 39-23.8(b)(1).

Second, even if Jane is not subject to liability on the TOP Properties as the alter ego of the Jane Trust, she is liable to Scott under § 39-23.8(b)(1) for a second yet related transfer: the transfer by Buddy to Jane of the proceeds of the sale of the TOP Properties. As discussed above, Buddy transferred the proceeds from the sale of the TOP Properties to Jane shortly after each sale closed. The $98,619.64 in net proceeds from 3615 TOP was deposited by Buddy into the Jane Checking Account on December 26, 2013. Similarly, the $99,800.00 in net proceeds from the 3613 TOP sale was converted into several cashier's checks by Buddy that he gave to Jane, who a month later "put them in her checking account."[104] Not only was there no consideration for either transfer, but the combined transfer of $198,419.64 from Buddy to Jane was part of their joint scheme to hinder and delay Scott's collection efforts on the 2011 Judgment. Therefore, Scott would be entitled to a judgment against Jane individually for $198,419.64 based on the net TOP Properties sale proceeds she received. However, since as stated above, Scott is entitled to a joint and several judgment against the Jane Trust and Jane as its alter ego in the amount of $216,500, the court will presume that he would elect the greater judgment amount.

## II.    First Cause of Action – Fraudulent Transfer of the WS/CBC Proceeds in 2001

In the First Cause of Action, Scott asserts that the transfer of the WS/CBC Proceeds from Buddy to Jane's RJ Account is avoidable under § 39-23.4(a)(1). As an affirmative defense, Jane asserts that this claim is barred by the UVTA's statute of repose, which provides, in relevant part:

---

[104] Test. of Buddy Hoch, December 11, 2017 Hr'g Audio at 01:35:10 – 01:35:40.

> A claim for relief with respect to a voidable transfer or obligation under this Article is extinguished unless action is brought . . . not later than four years after the transfer was made or the obligation was incurred, or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant . . . .

N.C. Gen. Stat. § 39-23.9(1). The transfer asserted to be fraudulent occurred when Buddy deposited the WS/CBC Proceeds into the RJ Account in 2001. Thus, Scott's claim for relief against Jane was extinguished in 2005 unless he can invoke the "savings clause" of the statute of repose.

The First Cause of Action survived summary judgment and proceeded to trial in part because "a question of fact exist[ed] with respect to whether Scott knew or could reasonably have discovered the transfer more than one year prior to filing the [2014 Lawsuit]."[105] Scott contends that he did not learn that the WS/CBC Proceeds were in Jane's RJ Account until the deposition of Richard Speers in the 2011 Lawsuit on July 26, 2013.[106] Because this action was filed on July 22, 2014, if indeed Scott did not know and could not reasonably have discovered that the WS/CBC Proceeds had been transferred from Buddy to Jane's RJ Account in 2001 until July 26, 2013, then his claim is timely-filed and Jane's affirmative defense fails. Conversely, if Scott knew or reasonably could have discovered that Buddy had transferred the WS/CBC Proceeds to Jane's RJ Account prior to July 22, 2013, then his claim has been extinguished by operation of § 39-23.9(1).

A recent case from the North Carolina Court of Appeals addressing precisely this issue is instructive. In *KB Aircraft Acquisition, LLC v. Berry*, -- N.C. App. --, 790 S.E.2d 559 (2016), *discr. rev. allowed*, 797 S.E.2d 3, *discr. rev. dismissed as improvidently granted*, 805 S.E.2d 670 (2017), the plaintiff brought a fraudulent transfer claim against the defendant and his entity based on a

---

[105] O Allowing in Part and Den. in Part Cross-Mots. for Summ. J., AP D.E. 89 at 14.
[106] Compl., AP D.E. 10 at 82.

transfer of real property made after defaulting on an obligation to the plaintiff's predecessor in interest, and the defendant successfully asserted the statute of repose as a defense.

In 2006, the plaintiff's predecessor-in-interest, Key Equipment Finance, Inc. ("Key"), loaned approximately ten million dollars ($10,000,000) to BerryAir, LLC ("BerryAir"), an entity owned and controlled by the defendant, Jack M. Berry, Jr. ("Berry"), to purchase an aircraft for use in BerryAir's business. *KB Aircraft*, 790 S.E.2d at 561.[107] Berry executed a personal guaranty to Key, and pledged to provide it with an annual personal financial statement. When the loan was made, he owned real estate in North Carolina (the "Property") worth approximately three million dollars ($3,000,000). Following BerryAir's default on the loan in 2008, on October 10 of that year Berry organized a new entity named 585 Goforth Road, LLC ("Goforth"). That same day, Berry conveyed the Property to Goforth via special warranty deed for no consideration. In 2009, Berry submitted an annual personal financial statement to Key that disclosed his personal real estate assets were now valued at only $353,355, but also stated that he owned a 100% interest in Goforth that he valued at $1,142,000. This financial statement was the first document given to Key that could have alerted it of Berry's transfer of the Property to Goforth. *Id.* at 561–62.

On September 30, 2010, Key sold and assigned all of its rights under the loan and guaranty to the plaintiff, KB Aircraft Acquisition, LLC ("KBA"). KBA instituted a legal action in Florida (where Berry lived) to collect on the loan and guaranty after a foreclosure sale of the aircraft left a deficiency of approximately ten million dollars ($10,000,000). *Id.* at 562–63 & 563 n.4. During the litigation, in December 2010, KBA conducted a title search on the Property, and discovered the 2008 transfer to Goforth. *Id.* at 563. After securing a judgment against Berry for the deficiency

---

[107] Berry and his wife were BerryAir's sole members.

in July 2013, KBA properly domesticated it in North Carolina. However, because the Property was no longer in Berry's name, KBA did not automatically obtain a lien on the Property. KBA brought suit against Berry and Goforth in North Carolina on December 2, 2013, alleging claims for relief under the UVTA. *Id.* Berry filed a motion for summary judgment, asserting that the KBA's claim was time-barred by the UVTA statute of repose. The motion was granted. *Id.* at 563.

The North Carolina Court of Appeals agreed with Berry, and affirmed the trial court. *Id.* at 570. In an issue of first impression, the appellate court held that § 39-23.9 operates as a statute of repose, not one of limitation, and crucially found that the statute "includes no language creating an exception for equitable doctrines, thereby precluding equitable remedies such as equitable tolling . . . ." *Id.* at 568.

Also pertinent here, the *KB Aircraft* court held that the plaintiff's claims under § 39-23.4(a)(1) were time-barred because the latest the plaintiff there reasonably could have discovered the transfer was December 2010 when it conducted a title search and found the deed from Berry to Goforth. *Id.* at 569. In rejecting the argument that the statute of repose begins to run from the date the fraudulent nature of the transfer becomes apparent to the creditor, rather than the date the transfer is complete, the court further observed that the earlier 2009 financial statements disclosing the sudden decrease in the value of Berry's real estate assets were "enough to cause a reasonable person with an interest in the Property to inquire further into its present status and to ultimately discover the alleged fraudulent nature of the transfer . . . ." *Id.* at 570. The court reasoned:

> "[A] plaintiff has a duty to exercise reasonable diligence to discover the fraud or misrepresentations that give rise to [its] claim. [W]hen an event occurs to excite the aggrieved party's suspicion or put [it] on such inquiry as should have led, in the exercise of due diligence, to a discovery of the fraud," that party is deemed to have inquiry notice of the same.

*KB Aircraft*, 790 S.E. 2d at 569–70 (citations omitted) (quoting *Doe v. Roman Catholic Diocese of Charlotte*, 242 N.C. App. 538, 543, 775 S.E.2d 918, 922 (2015)).

Here, the parties have already stipulated to the authenticity of the 2001 Agreement, its contents, and that it was signed by both Buddy and Scott prior to leaving the September 27, 2001 meeting. That document recites in its first numbered paragraph that Buddy would "give notice to Scott before transferring any money out of Jane's account at Raymond James."[108] The testimony at trial reinforces the court's conclusion that Scott knew or reasonably could have discovered the transfer of the WS/CBC Proceeds from Buddy to Jane beginning on September 27, 2001, as Mr. Speers credibly testified that not only had the location of the money been a key concern of Scott's at the September 27, 2001 meeting, but the fact that the WS/CBC Proceeds were in Jane's RJ Account was discussed orally at the meeting at least once.[109] Thus, as of September 27, 2001, Scott had been informed in writing and orally that the WS/CBC Proceeds were in "Jane's account at Raymond James." No testimony at trial contradicted this assertion; Scott and Buddy each testified that they had only vague memories of the meeting, which occurred sixteen years prior to the trial. Mr. Speers, however, had a firmer recollection of the meeting. He testified that while Scott never asked whether the money was in Jane's RJ Account, he wrote "Jane's account at Raymond James" into the 2001 Agreement because "that's where the money was."[110] Further, Mr. Speers testified that he made no effort to hide the location of the WS/CBC Proceeds, and that if Scott had asked him specifically where the money was located, he would have told him.[111] Moreover, Mr. Speers

---

[108] Stipulated Facts, Final Pretrial O, AP D.E. 100 at 3.
[109] Test. of Richard Speers, December 12, 2017 Hr'g Audio at 03:54:20 – 03:56:32.
[110] *Id.* at 03:40:28 – 03:40:35.
[111] *Id.* at 03:40:41 – 03:40:50.

testified that in the ensuing years, Scott would routinely inquire as to whether "the money was still there" and upon each inquiry he (Speers) informed Scott that the money remained in the account.[112]

Like the plaintiff in *KB Aircraft*, Scott was on inquiry notice that Buddy had transferred the WS/CBC Proceeds to Jane by September 27, 2001, when he met with Buddy, Mr. Speers, and Mr. Kapp and was informed both orally and in writing that the money was in "Jane's account at Raymond James." Buddy later made several misleading statements about the character of Jane's RJ Account,[113] but there is no provision in the UVTA statute of repose for tolling the running of the statute in the face of fraudulent conduct by the defendant transferor, except possibly where the defendant's fraudulent conduct made it impossible for the plaintiff to discover the transfer. That is simply not the case here, as the account location of the money was a fact known to Scott. Buddy's misleading statements to Scott were made years after the 2001 Agreement was drafted, and it was that writing that put Scott on inquiry notice that the WS/CBC Proceeds had been transferred to Jane, and she was not a party to any of the tolling agreements executed between Scott and Buddy.

The information in the 2001 Agreement states clearly that Buddy had transferred the WS/CBC Proceeds to Jane's account. This was discussed at least once in the conversation at Mr. Kapp's office. This was more than enough information "to cause a reasonable person with an interest in the [p]roperty to inquire further into its present status . . . ." *KB Aircraft*, 790 S.E.2d at 570. Mr. Speers was readily available for such further inquiries, and he testified that he would have

---

[112] *Id.* at 03:37:20 – 03:37:30.

[113] Specifically, in two verified pleadings signed by Buddy in the 2011 Lawsuit, he claimed that the WS/CBC Proceeds had been deposited into "his personal bank account," Pl.'s Ex. 6 at 3, ¶ 20, into "his bank account," *id.* at ¶ 26, and into "a personal bank account controlled by him." Pl.'s Ex. 6A at 8, ¶ 30. While the latter statement might be charitably characterized as "artful pleading" skirting the line of misleading, the former two statements are patently false and were admitted as such at trial. While the court condemns this conduct in the strongest possible terms, it does not provide a reed upon which Scott can rest a successful claim. The earlier of the pleadings was dated October 17, 2011. By that time, Scott's claim against Jane had long since expired. Consequently, even if Buddy had falsely told Scott he buried the WS/CBC Proceeds in his backyard or invested them in a bridge in Brooklyn, it would not have served to revive Scott's time-lapsed claim against Jane for the transfer of the WS/CBC Proceeds to her in 2001.

told Scott further details concerning the money in Jane's RJ Account if asked, but he never was. No action was taken for well over a decade; consequently the First Cause of Action is time-barred.

The court is sympathetic to Scott's plight and to that of other similarly-situated creditors. However, claims originating under § 39-23.4(a)(1) are subject to a rigid statute of repose, and this court is bound by North Carolina law. As the North Carolina Court of Appeals observed, the "'principles of law and equity' supplement the provisions of the UVTA . . . '[u]nless displaced by the provisions of [the UVTA].'" *KB Aircraft*, 790 S.E.2d at 565 (quoting N.C. Gen. Stat. § 39-23.10). Thus, equitable defenses like laches, estoppel, and unclean hands are unavailing even where, as here, the facts could otherwise support equitable intervention because of the unscrupulous and deceptive conduct of the defendants, particularly Buddy, and given the misleading pleadings. The court observes that, like the North Carolina Court of Appeals, it is "not the first to conclude that a frustrated claimant's plea for broader relief from a fraudulent transfer must be addressed to the legislative branch." *KB Aircraft*, 790 S.E.2d at 565.

## III.  Ninth Cause of Action – TDA Account Signatory Authority Fraudulent Transfer

Scott's final cause of action arising under the UVTA concerns Jane's revocation of Buddy's signatory authority on the TDA Account on August 14, 2013. He contends that when Jane revoked Buddy's signatory authority from the TDA Account, it was effectively "[Jane] and [Buddy] transferr[ing] [Buddy's] control of the account holding the WS/CBC sale proceeds . . . ."[114] The issue with the Ninth Cause of Action is whether this revocation of signatory authority, or transfer of "control" of the TDA Account, constitutes a "transfer" under the UVTA. For the reasons that follow, the court concludes that it does not.

---

[114] Compl., AP D.E. 10 at 94, ¶ 92.

33

### A.  The revocation of Buddy's signatory authority was not a transfer under the UVTA

Under the UVTA, a "transfer" is defined as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset . . . ." N.C. Gen. Stat. § 39-23.1(12); an "asset" is defined as "[p]roperty of a debtor," N.C. Gen. Stat. § 39-23.1(2); and "property" is defined in the broadest possible sense as "[a]nything that may be the subject of ownership." N.C. Gen. Stat. § 39-23.1(10). Within these interlocking definitions, the narrow issue here is whether signatory authority alone on an investment or bank account is "something that may be the subject of ownership."

Jane added Buddy as an authorized user on the TDA Account by submitting a Cash Management Services Additional User Form (the "Additional User Form") to TD Ameritrade dated December 3, 2009 and signed by both Jane and Buddy.[115] According to the Additional User Form, its purpose is to allow an account owner to "give an individual who is not an Account Owner check writing and debit card privileges on your account," and its language is clear that once conferred, such authority remains valid "until this authorization is revoked in writing and received by TD Ameritrade Inc. . . ."[116] Mr. Speers, who managed the TDA Account between 2009 and 2014, explained that as an authorized user on the TDA Account, Buddy could "write checks against the account," and could write a check for up to the full value of the account without prior permission or authorization from Jane.[117]

---

[115] Test. of Jane Hoch, December 13, 2017 Hr'g Audio at 00:29:45 – 00:30:30. *See also* Pl.'s Ex. 54.

[116] Pl.'s Ex. 54; Def.'s Ex. 21.

[117] Test. of Richard Speers, December 12, 2017 Hr'g Audio at 03:30:08 – 03:30:35. It should also be noted that a primary purpose of the Additional User Form is to protect the brokerage firm from liability to the account owner if the other signatory party should abscond with or grossly misuse the funds.

Regardless, Jane removed Buddy's signatory authority from the TDA Account by letter dated August 14, 2013.[118] In that same letter, she instructed TD Ameritrade to add her daughter Lindsey as an authorized user on the account.[119] Jane and Lindsey signed a new authorization form for Lindsey, but Buddy signed nothing to accomplish removal of his signature authority. Thereafter, Buddy no longer held the legal ability to write checks against the TDA Account without Jane's permission.

Scott has pointed to no authority, nor is the court aware of any, that stands for the proposition that signatory authority or "control" over the investment account of a spouse constitutes a property interest capable of being "transferred." In his Trial Brief, Scott cited the case of *Hoult v. Hoult*, No. Civ. A. 88-1738-DPW, 2002 WL 1009378, at *26 (D. Mass. May 13, 2002), *rev'd in part on other grounds*, 373 F.3d 47 (1st. Cir. 2004), for the proposition that a "wife's transfer of funds from an account which husband was a signatory to one in which he was not was 'part of a broader scheme by [husband and wife] fraudulently to convey [husband's] assets to hinder collection of the judgment by [creditor].'"[120]  It is true that the *Hoult* court concluded such a transfer was fraudulent, and that both spouses in that case were "authorized signatories on that account." *Hoult*, 2002 WL 1009378, at *26. However, the account at issue in *Hoult* was a *joint account*, meaning that both spouses were owners. *Id.* In a "joint account, either party may terminate the account or withdraw all funds from the account," *Jimenez v. Brown*, 131 N.C. App. 818, 825, 509 S.E.2d 241, 246 (1998), and both signatories to a joint account are also account owners. As made plain by the Additional User Form, Buddy's authority over the TDA Account was limited to

---

[118] Pl.'s Ex. 56.
[119] Pl.'s Ex. 55.
[120] Pl.'s Trial Brief, AP D.E. 99 at 8.

drafting checks against it; he did not have the authority to close the account because he was not the owner of the account.

All Buddy "possessed" by virtue of signatory authority over the TDA Account was analogous to what any corporate officer or agent "possesses" when designated as a signatory on the corporation's account—the right to make withdrawals on behalf of or with the permission of the owner, not actual ownership of the account and its contents.[121] The Additional User Forms make clear that Buddy's signatory authority could be revoked by Jane at any time, because Jane was the account owner, and, in an account with one owner and an additional user with signatory authority, the "funds are owed to the depositor by the bank and not to any signatory or other agent of the depositor." *Wachovia Bank, N.A. v. Tien*, 534 F. Supp. 1267, 1285 (S.D. Fla. 2007) (citing *Bank of Palmetto v. Hyman*, 290 F. 353 (5th Cir. 1923)).

Courts have routinely rejected arguments that one who possesses signatory authority on a deposit account possesses an ownership interest in the account. *See, e.g.*, *In re Walldesign, Inc.*, 872 F.3d 954, 971 (9th Cir. 2017) ("Corporations . . . often add non-employees like accountants, spouses, or other closely associated individuals as signatories to their accounts. This act alone, however, does not change *legal* ownership over the depository account."); *Gouveia v. Cahillane (In re Cahillane)*, 408 B.R. 175, 200 (Bankr. N.D. Ind. 2009) (declining to find account owned by signatory rather than corporation named as account holder where the "provision upon which the Trustee relies is essentially one which provides for an exemplar of the signatures of the authorized signatories for account transactions, not acknowledgement of account ownership."); *Ghlachi v.*

---

[121] In this context, it has been noted that "resolutions and signature cards do not confer any property or other rights to the signatories contained therein since they are for the account holder and the bank's protection and they are only evidence of the corporate agent's authority to operate the bank account." *Wachovia Bank, N.A. v. Tien*, 534 F. Supp. 1267, 1285 (S.D. Fla. 2007) (citing *Glens Falls Indem. Co. v. Palmetto Bank*, 23 F. Supp. 844 (W.D.S.C. 1938)).

*U.S. Bank, N.A.*, No. CV 14-6619 PSG (CWx), 2015 WL 12655411, at *6 (C.D. Cal. Apr. 29, 2015) ("It is possible to be the authorized signatory of a business account without being the owner of the account.").

Scott also cited *Schofield-Johnson, LLC v. United States (In re Schofield-Johnson, LLC)*, 462 B.R. 569 (Bankr. M.D.N.C. 2011) for the proposition that a fraudulent transfer may be found where "[t]he debtor had authority to write checks on his wife's account, and the funds . . . were used to support [joint] household expenses."[122] Again, there are several relevant distinctions. First, the transfer in *Schofield-Johnson* found to be fraudulent was a March 1, 2006 transfer of approximately one million dollars in proceeds from the husband into his wife's checking account, not the removal of signatory authority from that account. *Schofield-Johnson*, 462 B.R. at 541. The IRS took action to unwind that transfer in 2009, well within the UVTA's limitations period. *Id.* Moreover, when examining whether it was relevant that the husband retained control over the funds by virtue of his signatory authority, the court was evaluating the badges of fraud to determine whether the transfer to the wife's checking account was made with fraudulent intent, not whether a transfer had occurred. *Id.* at 544. There was no question in *Schofield-Johnson* as to whether the conduct at issue was a transfer—the husband took a check made out to himself, and put it into an account owned by his wife. *Id.* at 541. This fact pattern is analogous to one of the transactions before this court, but it was not the removal of Buddy's signatory authority from the TDA Account in 2013 but rather his deposit of the WS/CBC Proceeds into Jane's RJ Account in 2001 that constituted the comparable fraudulent transfer. The latter transaction was unquestionably a transfer: prior to negotiating the check, the WS/CBC Proceeds belonged to Buddy and would have

---

[122] Pl.'s Trial Brief, AP D.E. 99 at 7.

been available to satisfy a judgment against him; after depositing them in Jane's RJ Account, they legally became Jane's funds, and, absent recourse to the UVTA, would not have been available to satisfy a judgment against Buddy. The issue of signatory authority in *Schofield-Johnson* was relevant only to the third element of a UVTA claim: whether the transfer of funds was made with the intent to hinder, delay, or defraud—no party in that case asserted that conferral or removal of signatory authority constituted a transfer.[123]

Had the TDA Account been a joint account or held solely in Buddy's name, Scott may have been entitled to levy on the funds therein. *See Jimenez v. Brown*, 131 N.C. App. at 825, 509 S.E.2d at 246 ("We believe that equitable ownership should be the determining factor and thus hold that joint accounts are attachable to the extent of a debtor's contribution to the account."). *See also* N.C. Gen. Stat. § 53C-6-6(e) ("A bank is not liable to joint tenants for complying in good faith with a writ of execution, garnishment, attachment, levy, or other legal process that appears to have been issued by a court or other authority of competent jurisdiction and seeks funds held in the name of any one or more of the joint tenants."). However, the fact that Buddy's signatory authority over the TDA Account is not "something that may be the subject of ownership" is even clearer when the alleged "transfer" of that signatory authority from Buddy to Jane is examined from the perspective of Jane, the hypothetical transferee. After the removal, Jane purportedly was given "something that may be the subject of ownership" by Buddy, yet her ownership position and legal rights in the TDA Account and its contents did not change whatsoever. She remained the sole

---

[123] Even if removing signatory authority could be a transfer such that Scott would be entitled to have that removal declared void under § 39-23.7(a)(1), the only result would be to return the TDA Account to the *status quo* of August 13, 2013: Jane would own the account, and Buddy would be a mere signatory. It still would remain beyond Scott's judgment execution, as Scott has pointed to no precedent, nor is the court aware of any, that would permit a creditor with a judgment against one spouse to execute against the bank account held solely in the name of the other spouse, as opposed to a joint account.

account owner, a signatory, and the only person capable of closing the account or adding or removing signatories.

Accordingly, because Buddy's signatory authority over the TDA Account was not "property" or "something that may be the subject of ownership," it could not be the subject of a transfer under the UVTA, and its removal by Jane did not create a cause of action thereunder.

### B.  Absence of an effective remedy

Taking the matter a step further, even if Scott were entitled to a judgment against Jane as the "transferee" of the signatory authority, such a judgment must be valued at zero. First, as discussed above, it is difficult to find that Jane "received" anything from the "transfer," since her position with respect to the account did not change when she revoked Buddy's signatory authority. More importantly, while Scott argues that the TDA Account is worth its balance as of the date of revocation, upon closer examination this approach is flawed because signatory authority alone has no market value. First, signatory authority is not freely transferrable, as the Additional User Form clarifies: Buddy could write checks against the account, but he could not grant this power to any other person. Only the account owner, Jane, could accomplish that. Second, the signatory authority was revocable at will by the account owner, Jane. Thus, assuming Scott could subrogate himself to Buddy's position with respect to the TDA Account, Jane could ensure such a position was short-lived by removing Scott's inherited rights. Third, the signatory authority was not exclusive. Jane could, theoretically, grant signatory authority on the TDA Account to dozens of authorized users and dilute the "value" of any one authorized user.

Because the signatory users own and can convey nothing, no resultant dilution occurs. Signatory authority is not an asset with independent pecuniary value, and is instead best understood as a relationship. The form giving Buddy a right to issue checks without challenge from TD

Ameritrade is a contract between Jane and the brokerage firm only, and exists for the protection of TD Ameritrade from a subsequent claim against it by Jane as the account owner.

Because the court concludes that the removal of Buddy's signatory authority over the TDA Account in 2013 was not a "transfer" under the UVTA, and that Scott would not be afforded an effective remedy in any event, it is not necessary to examine whether Scott was a creditor of Buddy at that time or whether the "transfer" was made with the actual intent to hinder, defraud, or delay Buddy's creditors. Because Scott has failed to prove an element of a *prima facie* fraudulent transfer claim under § 39-23.4(a)(1), he is not entitled to relief regarding the Ninth Cause of Action.

### IV.    Fourth Cause of Action – Fraud by Buddy regarding the WS/CBC Proceeds

In the Fourth Cause of Action, Scott alleges a common law fraud claim against Buddy, on the basis that "[Buddy] purposely made false representations to [Scott] regarding where the WS/CBC sale proceeds distributed to [Buddy] were held."[124] Scott alleges that he was damaged by Buddy's misrepresentation over the true location of the WS/CBC Proceeds because he had "to incur the cost and expense associated with bringing this lawsuit to bring the [WS/CBC Proceeds] within the purview of North Carolina's judgment execution procedures."[125]

In order to successfully recover under a theory of common law fraud, a plaintiff must prove five elements: "1) a false representation or concealment of a material fact, 2) reasonably calculated to deceive, 3) made with intent to deceive, 4) which does in fact deceive, and which 5) results in damage to the injured party." *Town of Belhaven v. Pantego Creek, LLC*, -- N.C. App. --, 793 S.E.2d 711, 718 (2016) (quoting *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 39, 626 S.E.2d 315, 321 (2006)).

---

[124] Compl., AP D.E. 10 at 90, ¶ 56.
[125] *Id.* at 90, ¶ 59.

Here, while the Complaint certainly should have articulated what specific false representations were made and when they were made, from the evidence presented at trial it appears that the misrepresentations complained of were (1) a handwritten letter written by Buddy and faxed to Scott from Richard Speers on December 5, 2001[126] (the "December Letter") in which he wrote that Scott "knew I had the WS-CBC funds which I paid out to myself" and that the WS/CBC Proceeds were "the only leverage [Buddy] ha[d] to get [Scott] to fulfill [his] responsibilities toward [Buddy];"[127] (2) two pleadings filed by Buddy in 2011 in which he referred to the WS/CBC Proceeds as "in…his bank account" and in "his personal bank account" or in a "personal bank account controlled by him"[128] (the "2011 Pleadings"); and (3) testimony Buddy gave in a 2013 deposition that is not in evidence.

Assuming, *arguendo*, that each misrepresentation actually constituted a communication by Buddy to Scott that the WS/CBC Proceeds were in an account in Buddy's name or otherwise sufficiently under his control or possession such that the funds could be reached by executing on a judgment against Buddy alone, Scott's claim still fails. Whether the WS/CBC Proceeds were in Buddy's account or Jane's account, a central material fact remains—for Scott to have clear recourse to the WS/CBC Proceeds in 2001, he must sue Jane in a timely manner. Even if Buddy made each representation with the intent to deceive Scott, Scott could not have reasonably relied on such representations, because he knew or should have known by the end of September 2001 that the WS/CBC Proceeds were parked in Jane's RJ Account. In addition, he failed to show sufferance of new and actual damages arising from the allegedly false representations.

---

[126] Pl.'s Ex. 3.

[127] Pl.'s Ex. 3 at 13. Buddy and Scott had disputes over several other properties and developments during this time. Buddy admits that he sought to use the WS/CBC Proceeds as "leverage" to force a global settlement.

[128] Pl.'s Ex. 6A at 8, ¶¶ 20, 26, and 30.

41

### A.  Scott did not reasonably rely on Buddy's misrepresentations

Demonstrating mere reliance on a false representation, without more, is insufficient, as "any reliance on the allegedly false representations must be reasonable." *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007) (citing *Johnson v. Owens*, 263 N.C. 754, 757, 140 S.E.2d 311, 313 (1965)). To demonstrate that his reliance was reasonable, a plaintiff "must show that he could not have discovered the facts upon inquiry or that he was prevented the opportunity to learn those facts." *Friedman v. Campbell (In re Campbell)*, 545 B.R. 875, 889 (Bankr. M.D.N.C. 2016) (citing *Harding v. S. Loan & Ins. Co.*, 218 N.C. 129, 10 S.E.2d 599 (1940), and *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 554 S.E.2d 840 (2001)).

As discussed in detail with respect to the First Cause of Action, Scott was on inquiry notice that the WS/CBC Proceeds had been transferred by Buddy to Jane on September 27, 2001, when he attended the meeting with Mr. Kapp, Mr. Speers, and Buddy. The fact that the funds were in Jane's RJ Account was mentioned orally at the meeting at least once, and Scott signed the 2001 Agreement that recited the location of the WS/CBC Proceeds in its first paragraph. Further, Scott did not present any evidence that he was prevented from learning of the true location of the WS/CBC Proceeds, and thereby learning of the transfer of the same by Buddy to Jane in 2001. On the contrary, Mr. Speers testified that he never withheld the location of the funds from Scott, and that had Scott ever asked precisely where the funds were, he would have told him. Despite the fact that Scott inquired of Mr. Speers several times over the years as to whether the funds were still "there," he apparently never asked any follow up questions to confirm where "there" was. Further, in light of the fact that Scott and Buddy were in an adversarial posture towards one another as evidenced by their inability to settle their disputes at the September 27, 2001 meeting and the

subsequent execution of thirty (30) tolling agreements[129] intended to preserve their rights with respect to those disputes, any reliance by Scott on a statement made by Buddy in the December Letter appears even more unreasonable.

Finally, while Buddy's sworn statements in 2011 and 2013 may have been false, Scott was not entitled to rely on them because he was already on inquiry notice of the true location of the WS/CBC Proceeds and, consequently, the transfer of the same by Buddy to Jane in 2001. The court does not intend to suggest that parties are not entitled to rely on the sworn testimony of their adversaries; it is simply observing that where a party knows or could have known that a set of facts existed in 2001, it is not reasonable for that same party to blindly rely on sworn statements that contradict those facts ten years later. For example, had the individual defendant in *KB Aircraft* signed an affidavit in 2010 swearing that he still owned the property that was transferred in 2008, the plaintiff could not reasonably rely on that affidavit in light of its 2008 title search that disclosed the deed clearly documenting the transfer.

### B.  Scott did not suffer damages as a result of Buddy's misrepresentations

Scott claims that he was damaged by Buddy's misrepresentations in that he had "to incur the cost and expense associated with bringing this lawsuit. . . ."[130] However, Scott already holds a judgment against Buddy on the WS/CBC Proceeds, and because his legal fees and other costs in bringing this action are not recoverable as independent damages on a fraud claim, he has failed to prove that he suffered legally cognizable damages as a result of any misrepresentation by Buddy.

North Carolina follows the American rule with respect to attorneys' fees. *See, e.g.*, *Hicks v. Albertson*, 284 N.C. 236, 238, 200 S.E.2d 40, 42 (1973); *In re King*, 281 N.C. 533, 540, 189

---

[129] *See* Pl.'s Exs. 4 & 5.
[130] Compl., AP D.E. 10 at 90, ¶ 59.

43

S.E.2d 158, 162 (1972). Thus, "[u]nder North Carolina law, 'a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute.'" *Laschkewitsch v. Legal & Gen. Am. Inc.*, 247 F. Supp. 3d 710, 723 (E.D.N.C. 2017) (quoting *Silicon Knights, Inc. v. Epic Games, Inc.*, 917 F. Supp. 2d 503, 516 (E.D.N.C. 2012)). Fraud is a common law tort. *Holley v. Coggin Pontiac, Inc.*, 43 N.C. App. 229, 241, 259 S.E.2d 1, 9 (1979); *see also* N.C. Gen. Stat. § 4-1.

Costs are recoverable by a plaintiff under North Carolina law only in certain listed types of cases, none of which apply here. *See* N.C. Gen. Stat. § 6-18. If the right is not statutorily granted, costs may be recoverable in the discretion of the court [N.C. Gen. Stat. § 6-20], but only "to the party for whom judgment is given . . . ." N.C. Gen. Stat. § 6-1. "[F]or actions governed under section 6–20, such as negligence actions . . . , the trial court has the discretion to determine whether or not to award costs to the prevailing party . . . ." *Khomyak ex rel. Khomyak v. Meek*, 214 N.C. App. 54, 59–60, 715 S.E.2d 218, 221 (2011). As a result, being the "prevailing party" is a necessary but alone insufficient condition to recover costs in a fraud action. Being the prevailing party necessarily means establishing a *prima facie* case that, in the context of fraud, would include some independent damages aside from costs. *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself.").

Because his fraud claim derives from the common law, Scott must point to some independent statutory authority authorizing the recovery of attorneys' fees as costs or damages. He has not done so, nor is the court aware of any such statute allowing recovery of attorneys' fees as damages for a common law fraud claim. Moreover, Scott cannot rely on the prospective

44

recovery of costs to satisfy an element of his fraud claim. Accordingly, because his costs and attorneys' fees are not legally cognizable damages with respect to his fraud claim, Scott has failed to demonstrate that he has suffered damages as a result of Buddy's misrepresentations.

Scott's claim for fraud could also be interpreted as seeking damages for the lost opportunity to bring a UVTA claim against Jane based on the 2001 transfer of the WS/CBC Proceeds. The argument is that *but for* Buddy's misrepresentations, Scott would have discovered the transfer of the WS/CBC Proceeds from Buddy to Jane in 2001 and could thereafter have timely brought a UVTA claim against Jane (before 2005), and he has been damaged because such a claim is now time-barred. However, as discussed above with respect to the First Cause of Action, Scott could have discovered the transfer of the WS/CBC Proceeds on September 27, 2001, and the fact that Buddy made misrepresentations about the transfer or location of the funds after the statute of repose had run is irrelevant—even if Buddy had told the truth in 2011 or 2013, Scott's remedy against Jane would have been time-barred. Moreover, as discussed above, Scott could not reasonably rely on the December Letter in light of the 2001 Agreement and the September 27, 2001 meeting.

Because Scott has failed to prove reasonable reliance on any misrepresentation by Buddy, and because he has not shown that he suffered legally cognizable damages resulting from such a misrepresentation, Scott is not entitled to relief with respect to the Fourth Cause of Action.

## V.    Seventh Cause of Action – Breach of the 2001 Agreement by Buddy

Finally, Scott asserts a breach of contract claim with respect to the 2001 Agreement. Specifically, he maintains that Buddy breached the 2001 Agreement by "not giving notice to [Scott] prior to transferring the WS/CBC sale proceeds out of 'Jane's account at Raymond

James.'"[131] Scott contends that he was damaged by this breach by "having to incur the cost and expense associated with bringing this lawsuit . . . ."[132]

In order to recover in a breach of contract action, the plaintiff must show the "(1) existence of a valid contract and (2) breach of the terms of that contract." *S. Shores Realty Servs., Inc. v. Miller*, -- N.C. App. --, 796 S.E.2d 340, 348 (2017) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)). Like fraud, breach of contract is a common law cause of action that does not support the recovery of attorneys' fees by the prevailing party in the absence of reciprocal language authorizing recovery of fees in the contract itself. N.C. Gen. Stat. § 6-21.6 (allowing for the recovery of attorneys' fees in breach of contract actions for certain contracts with reciprocal provisions for the same); *Hicks v. Clegg's Termite & Pest Control, Inc.*, 132 N.C. App. 383, 385–86, 512 S.E.2d 85, 86 (1999) (prior to 2011 enactment of N.C. Gen. Stat. § 6-21.6, observing that the General Assembly had ample opportunity to include breach of contract actions in list of actions where attorneys' fees were recoverable as a matter of course, but had declined to do so). Further, even where a prevailing party is entitled to attorneys' fees by virtue of a statute or contractual language, such an award is within the discretion of the trial court. *Martin Architectural Prods., Inc. v. Meridian Const. Co.*, 155 N.C. App. 176, 182, 574 S.E.2d 189, 193 (2002).

Here, Scott has not pled or produced evidence of independent damages outside of his costs and attorneys' fees connected with bringing this action. Further, the court finds that Scott could not have suffered damages as a result of the lost opportunity to bring a timely suit against Jane under the UVTA, because the 2001 Agreement was breached by Buddy, if at all, in 2009 when Jane moved the WS/CBC Proceeds from the RJ Account to the TDA Account. Even if Buddy had

---

[131] Compl. AP D.E. 10 at 93, ¶ 79.
[132] *Id.* at 93, ¶ 80.

46

performed his duty to inform Scott of that transfer, Scott would have been too late to timely bring a fraudulent transfer action against Jane, because the transfer for which she may have been liable occurred in 2001 and the statute of repose expired in 2005. Scott's position with respect to the WS/CBC Proceeds would have been identical whether or not Buddy breached the 2001 Agreement. If Buddy did not inform him, which appears to be the case, Scott's claim against Jane is time-barred. Even if Buddy had informed him of the transfer in 2009, his claim would still be blocked by the passage of time.

Because Scott has failed to prove that he suffered any new or additional damages resulting from Buddy's alleged breach of the 2001 Agreement beyond the damages awarded in the 2011 Lawsuit, he is not entitled to further relief in this case with respect to the Seventh Cause of Action.

## CONCLUSION

For the reasons stated, the court finds in favor of the Plaintiff, Scott Hoch, on the Second Cause of Action and will enter judgment against Jane and the Jane Trust, jointly and severally, in the amount of $216,500. The court finds in favor of the Defendants on and dismisses the First, Fourth, Seventh and Ninth Causes of Action. Each party shall bear its own costs. A separate judgment will be entered consistent with this Opinion.

## END OF DOCUMENT